**ESSEX CRANE RENTAL CORP. and Vincent A. Morano, Appellants,**

**v.**

**Eric G. CARTER d/b/a Eric G. Carter & Associates, Appellee.**

**Essex Crane Rental Corp. and Vincent A. Morano, Appellants,**

**v.**

**Kenneth Beverly, Appellee.**

**Essex Crane Rental Corp. and Vincent A. Morano, Appellants,**

**v.**

**David W. Farley, Appellee.**

Nos. 01–09–00813–CV, 01–11–00688–CV, 01–11–00689–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 29, 2012.

Rehearing Overruled June 7, 2012.

Kenneth O. Corley, Thompson & Knight, L.L.P., Misty Annette Hataway–Cone', Robert Alan York, Godwin Ronquillo PC, Thomas W. Sankey, Thomas W. Sankey, P.C., Houston, TX, for Appellant.

Tammy Danberg–Farney, O. Kyler Carter, The Carter Law Firm, Teri H. Kelley, William C. Nantz, Finis E. Cowan, Richard M. Forrest, Forrest Law Group, David M. Smith, David M. Smith & Associates, David W. Farley, Houston, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

## OPINION

EVELYN V. KEYES, Justice.

Appellees, Eric G. Carter d/b/a Eric G. Carter & Associates, David W. Farley, and Kenneth Beverly, filed motions for rehearing and motions for en banc reconsideration of our opinion issued on August 25, 2011. We grant the motions for rehearing, deny as moot the motions for en banc reconsideration, withdraw our opinion and

judgment of August 25, 2011, and issue this opinion and judgment in their stead.[1]

Appellants Essex Crane Rental Corp. and Vincent A. Morano (collectively, "Essex") appeal the trial court's judgments in favor of appellees and the trial court's order granting Beverly's motion to quiet title. In four issues, Essex contends that the trial court (1) improperly sustained Beverly's objections to its summary judgment evidence, (2) erroneously rendered summary judgment in favor of Beverly, (3) erroneously rendered summary judgments in favor of Carter and Farley, and (4) erroneously granted Beverly's motion to quiet title.

We reverse and remand.

## FACTUAL BACKGROUND

### A. The TWC Litigation and Settlement Agreement

In the mid–1990s, the Texas Workers' Compensation Insurance Fund (the "Fund") and the Texas Workers' Compensation Facility (the "Facility") filed separate suits against several business entities (the "McPherson Entities") owned and/or operated by James W. McPherson, Sr. ("McPherson, Sr.") seeking to collect millions in unpaid workers' compensation dues (the "Fund Litigation" and the "Facility Litigation," collectively the "TWC Litigation"). Among the McPherson Entities sued in the TWC Litigation was Coastal Terminal Operators, Inc. ("Coastal").

The TWC Litigation was settled prior to judgment in May 1999 when, pursuant to a plea and probation agreement in connection with criminal charges pending against him in federal court, McPherson, Sr. and the McPherson Entities entered into a settlement agreement (the "TWC Settlement Agreement") whereby they agreed to pay a total of $900,000 to the Fund and the Facility over a period of several years, collateralized in part by equipment owned by the McPherson Entities. In the event the McPherson Entities filed bankruptcy, receivership, or insolvency proceedings, the Fund and the Facility reserved the right to seek damages against them of up to $3,147,844, the total amount of unpaid workers' compensation dues, with credit for payments previously made. In return, the Fund and the Facility released the McPherson Entities from any liability relating to the facts of the TWC Litigation.

These agreements were set out in Paragraph 10 of the TWC Settlement Agreement, which provided:

> In the event of a bankruptcy, receivership, or insolvency proceeding, of any kind, by way of Coastal Defendant(s) or McPherson Interests, Ltd., that adversely affects in any manner the enforceability of any term of this Agreement or reduces any of the consideration to be derived from the Fund or the Facility hereunder, the Fund and the Facility's release of that defendant shall be null and void and the Fund and the Facility will be free to assert all causes of action, including causes of action for fraud and to contest the dischargeability of debts, that the Fund or the Facility now or hereunder may have against that defendant relating to the facts that form the basis for the Fund Lawsuit or the Facility Lawsuit seeking actual damages in the aggregate that do not exceed $3,147,844. In such event, all amounts

---

1. *See Brookshire Bros., Inc. v. Smith,* 176 S.W.3d 30, 41 & n. 4 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (holding that when party files both motion for rehearing and motion for en banc reconsideration, "it has long been the practice of this Court to present the motion for rehearing ... to the original panel of justices who heard the case" and that if original panel grants rehearing, motion for rehearing en banc is rendered moot).

previously paid toward the settlement hereunder will be credited against any Judgment obtained against that defendant. Any such bankruptcy proceeding shall not affect the validity of the remainder of this Agreement or the obligations of the other Parties hereto.

## B. The Essex Litigation and Judgment in Favor of Essex

In the late 1990s, Coastal, one of the McPherson Entities and a settling defendant in the TWC Litigation, contracted to rent cranes from Essex. McPherson, Sr. personally guaranteed the payment of all rentals to Essex. In 2000, Essex sued Coastal and McPherson, Sr., seeking recovery of unpaid crane rental fees (the "Essex Litigation"). On August 23, 2002, Essex was awarded judgment against Coastal and McPherson, Sr. in the principal amount of $491,261.87 (the "First Essex Judgment"). The principal and interest portion of that judgment was affirmed on appeal in August 2004. *See Coastal Terminal Operators v. Essex Crane Rental Corp.*, No. 14–02–00627–CV, 2004 WL 1795355, at *9 (Tex.App.-Houston [14th Dist.] Aug. 12, 2004, pet. denied) (mem. op.). The issue of attorney's fees was severed and remanded. *Id.* The trial court tried and awarded attorney's fees and statutory interest on the claim on March 22, 2006 (the "Second Essex Judgment"). Essex contends that the amount owed by Coastal and McPherson on the two Essex Judgments, including post-judgment interest, now exceeds $900,000.

## C. The Underlying Lawsuit

In the latter part of 2002, Essex began collection efforts on the First Essex Judgment, entered on August 23, 2002. Having no success, on December 10, 2002, Essex filed the underlying suit against McPherson, Sr. and Coastal, along with seven other defendants,[2] alleging that all of the defendants "conspired with each other to fraudulently transfer, hide, secrete or otherwise conceal assets with the intent to avoid payment of the debt" to Essex. Essex subsequently amended its petition to raise similar allegations of fraud and conspiracy against appellees Beverly, Carter, and Farley. Specifically, Essex alleged that Beverly, Carter, and Farley conspired with the McPherson Entities to fraudulently transfer assets in an attempt to avoid satisfaction of the Essex Judgments.

## D. The Agreed Judgments in the TWC Litigation and the Assignment of the Fund's and the Facility's Rights Under the TWC Settlement Agreement to HII

The summary judgment evidence establishes that, following entry of the First Essex Judgment, in late 2002, attorneys Carter and Farley, representing McPherson, Sr. and the McPherson Entities, began negotiating with the Fund and the Facility for an assignment of the Fund's and the Facility's rights under the TWC Settlement Agreement (the "Assignment"). The Fund and the Facility agreed to assign whatever rights they had under the Agreement to Houston Industrial Investments, LLC ("HII"), an entity incorporated by Farley on March 8, 2002, in exchange for payment to them of the remaining balance of $275,000 due under the terms of the Agreement. James W. McPherson, Jr., McPherson, Sr.'s son, was the sole owner and managing member of HII, and Carter was the registered agent. McPherson, Jr. testified at his deposition

---

**2.** Neither Coastal Terminal Operators, Inc., James W. McPherson, Sr., nor any of the seven other original defendants—Coastal Stevedoring Corporation, Jacintoport Corpora-tion, Jacintoport Corporation, McPherson Interests, Ltd., James W. McPherson Family Trust, James W. McPherson, Jr. and Cara Hood—is a party to this appeal.

that he sought the Assignment "in order to protect [his] assets" and that HII was created to separate its assets from his own. Carter and Farley drafted the assignment.

Following the execution of the Assignment, HII entered into two agreed judgments, likewise drafted and signed by Carter and Farley with McPherson, Sr. in the TWC Litigation (the "TWC Agreed Judgments"). In both the Fund Litigation and the Facility Litigation, HII, as successor in interest to the Fund and the Facility, took a final judgment against several of the McPherson Entities for $1.5 million in actual damages, $250,000 in attorneys' fees, and foreclosure on certain property the McPherson Entities had used to collateralize the TWC Settlement Agreement. The TWC Agreed Judgments totaled over $3 million.

McPherson, Sr. testified that HII took the Agreed Judgments to help out the family. He also testified that he consulted with Carter before he took the Agreed Judgments. The Travis County court that entered the Agreed Judgments was not informed of the relationship between the plaintiff, HII, and the defendant, McPherson, Sr.—i.e., that HII was controlled by the son of McPherson, Sr. Nor was it informed that HII had obtained the Assignment of the Fund's and the Facility's rights as judgment creditors against McPherson, Sr. and the McPherson Entities in exchange for fully paying off the debt owed to the Fund and the Facility under the terms of the TWC Settlement Agreement. Nor was it informed that the events that triggered the Fund's and the Facility's right to seek actual damages against the McPherson Entities under Paragraph 10 of the TWC Settlement Agreement—"[A] bankruptcy, receivership, or insolvency proceeding, of any kind, by way of Coastal Defendant(s) or

McPherson Interests, Ltd., that adversely affects in any manner the enforceability of any term of this Agreement or reduces any of the consideration to be derived from the Fund or the Facility hereunder"—had not occurred. Writs of execution were issued under the TWC Agreed Judgments, and the collateralized assets of the McPherson Entities (including equipment valued at $625,000) were transferred to HII.

Essex contends, both at trial and on appeal, that the Agreed Judgments were fraudulently procured and are a sham. It asserts that the TWC Settlement Agreement capped the McPherson Entities' liability to the Fund and the Facility at $900,000; that all but $250,000 of this debt was paid over a period of time, and that the remaining $250,000 was paid in return for the assignment of the Fund's and the Facility's rights to payment from McPherson, Sr. and the McPherson Entities to HII; and that, under the terms of the TWC Settlement Agreement and the Assignment, the Fund and the Facility had no remaining rights to payment by McPherson or the McPherson Entities to assign to HII, an entity wholly owned and controlled by McPherson, Sr.'s son. Therefore, the Agreed Judgments taken by HII and upon which execution issued were fraudulent. Appellees, however, contend that the provision Essex relies upon, set out in Paragraph 10 of the TWC Settlement Agreement, did not provide the exclusive remedy of the Fund and the Facility against McPherson, Sr. and the McPherson Entities and that HII, as assignee of the rights of the Fund and the Facility was entitled to seek from McPherson and the McPherson Entities the full amount of the judgments the Fund and the Facility had originally obtained.

**E. The Transfer of the Montgomery House**

At the time of the Essex Judgments, McPherson, Sr. owned a house in Montgomery County, Texas (the "Montgomery House"). Essex obtained a lien on the Montgomery House, then in McPherson, Sr.'s name, through the filing of an abstract of judgment relating to the Essex Judgments.

Beverly had worked as McPherson, Sr.'s accountant since 1989 or 1990 and was also a long-time friend. McPherson Sr. defaulted on the bank loan and lien securing the Montgomery House, and the note was accelerated by the bank. On April 1, 2003, following entry of the two Essex Judgments, and without ever seeing the subject property, Beverly purchased the bank note and lien on the Montgomery House, extinguishing Essex's judgment lien. Beverly purchased the bank note with the assistance of Dr. Jules Balette. Beverly and Balette had a long-standing relationship, and Balette testified that he trusted Beverly. Over the course of several months, Balette and his fiancee, Cathy Muriel, loaned Beverly over $200,000 with respect to the Montgomery House. Balette testified that he believed he was loaning the money for the Montgomery House to McPherson, Sr. as a favor.

Despite being McPherson, Sr.'s accountant and friend, and despite having purchased the note and lien on the Montgomery House prior to foreclosure by the lender, Beverly testified that he did not previously know that McPherson, Sr. owned the house. Beverly also claimed that he was not attempting to help McPherson, Sr. and that this was nothing more than a real estate investment. However, McPherson, Sr., who was living in the house although it was not his homestead, was never forced to move out. Instead, Beverly rented the Montgomery House back to McPherson, Sr. and his family. McPherson, Sr., either personally, or through one of the McPherson Entities, paid monthly rent on the home and reimbursed Beverly for taxes and homeowners' insurance costs, even though he no longer owned the property.

Contrary to Beverly, McPherson, Sr. testified that Beverly purchased the Montgomery House to try to help him out. Specifically, McPherson, Sr. testified that, by purchasing the note on the Montgomery House, Beverly allowed him "more time to get some money together to buy the property back." Dr. Balette confirmed McPherson, Sr.'s version of events by testifying that he understood he was giving money to Beverly and that "Beverly was going to do something to help Mr. McPherson with his house." Balette also testified that everything Beverly had said about the Montgomery House had been "a mixture of lies and truth" and that he never would have gotten involved had he known the truth because this "was not a clean deal."

Following the sale of his homestead in Harris County, McPherson, Sr. attempted to buy back the Montgomery House. His intent was to use the proceeds from the sale of his Harris County homestead to buy back the Montgomery House from Beverly, designate it as his homestead, and thus protect the Montgomery House from seizure. However, Stewart Title declined to issue a title policy for McPherson, Sr.'s repurchase because the person seeking to purchase the property (McPherson, Sr.) was the same person who had owned the property prior to foreclosure, which made the entire foreclosure questionable.

On December 22, 2005, around the time that the proceeds from the sale of McPherson, Sr.'s Harris County homestead property would lose their statutory exemption from execution, McPherson, Sr. wire-transferred $150,000 to Beverly. Beverly testified that, at the time he received these

funds, he was not sure why they were sent to him. McPherson, Sr. claimed the payment was intended for the repurchase of the Montgomery House, despite the fact that the transfer occurred after the date scheduled for the closing on the sale of the Montgomery House. As a result of Stewart Title's reservations, however, the repurchase of the Montgomery House was never consummated and title to the Montgomery House remains in Beverly's name. Beverly ultimately returned to McPherson over $60,000 of the funds originally wire-transferred to him.

## PROCEDURAL BACKGROUND

On August 17, 2006, Carter filed a no-evidence motion for summary judgment on Essex's fraud and civil conspiracy claims against him. Essex timely responded and the motion was set for submission on September 11, 2006. The trial court did not rule on Carter's first summary judgment motion.

On July 19, 2007, Carter filed a second motion, entitled "Motion for Traditional Summary Judgment and Motion for Severance," with respect to the civil conspiracy to commit fraud claim pending against him.

Four days later, on July 23, 2007, Beverly filed a no-evidence motion for summary judgment on Essex's fraud and civil conspiracy claims against him and a "Motion for Partial Summary Judgment on Lien Element of Conspiracy to Commit Fraudulent Transfer." Beverly's partial motion for summary judgment also included a motion to quiet his title to the Montgomery House.

Also on July 23, 2007, Carter filed another, separate no-evidence motion for summary judgment on Essex's civil conspiracy claims, together with a motion for summary judgment on damages and a motion for joinder in co-defendant Beverly's motion for summary judgment.

Essex timely responded to Beverly's and Carter's various motions.

On August 10, 2007, Carter filed objections to Essex's summary judgment evidence. The trial court never ruled on these objections.

On August 15, 2007, following a hearing on August 13, the trial court granted Beverly's no-evidence motion for summary judgment. Also on August 15, 2007, the trial court signed separate orders (1) granting Carter's motion for summary judgment as to Essex's fraud and civil conspiracy claims[3] and (2) severing Essex's claims against Carter and Beverly into the same severed cause of action.[4]

---

3. Carter filed four motions for summary judgment—two traditional motions for summary judgment and two no-evidence motions for summary judgment. The trial court's order rendering summary judgment in Carter's favor, however, does not identify which of these motions it intended to grant. The order simply refers to "Carter's Motion for Summary Judgment as to Plaintiff's claims of Fraud and Conspiracy."

4. Because these two separate orders eventually resulted in two different final judgments, this Court issued an order assigning them two separate trial court cause numbers and separate appellate cause numbers. Thus, all claims between Essex and Carter were severed into trial court cause number 2002–62464–A and disposed of by the trial court on August 15, 2007, which resulted in appeal number 01–09–00813–CV. Regarding the claims between Beverly and Essex, the trial court issued further orders following its August 15, 2007 severance and final judgment pursuant to the parties' post-judgment motions. All claims between Beverly and Essex were finally disposed of on September 24, 2007. Thus, we assigned those severed claims the trial court cause number 2002–62464–B and appellate cause number 01–11–00688–CV.

On August 27, 2007, Essex filed a motion to set aside and/or amend the severance orders and a separate motion to reconsider the summary judgments rendered in Carter's and Beverly's favor.

On August 30, 2007, Farley filed a motion for summary judgment and severance on the same grounds raised by Carter in his previously granted motion for summary judgment. Farley incorporated by reference the arguments presented in Carter's prior motions and contended that, as an attorney similarly situated to Carter, he was entitled to summary judgment for the same reasons as Carter. Essex again timely responded and the matter was fully briefed.

On September 4, 2007, Beverly filed his "Objections to Evidence Cited in Plaintiffs' Response to No–Evidence Motion for Summary Judgment"—a motion which the trial court had already granted on August 15. Essex did not respond to Beverly's objections.

On September 24, 2007, the trial court denied Essex's motion to set aside or amend the severance orders and its motion to reconsider the summary judgments rendered in Carter's and Beverly's favor. That same day, the trial court signed an order quieting Beverly's title to the Montgomery House. The next day, September 25, 2007, the trial court granted Farley's motion for summary judgment and motion to sever.[5]

On September 26, 2007, the trial court signed an order granting Beverly's objections to Essex's summary judgment evidence in their entirety. This is the only trial court order sustaining any objections to the summary judgment evidence.

To avoid trying the remaining case against only some of the defendants, Essex entered into a tolling agreement with the remaining defendants and agreed to nonsuit its claims against them without prejudice pending appeal of the motions granted by the trial court.

## STANDARD OF REVIEW

We review a trial court's grant of summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). When a party has filed both a traditional and a proper no-evidence summary judgment motion, we first review the trial court's summary judgment under the no-evidence standard of Texas Rule of Civil Procedure 166a(i). *See Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004).

To prevail on a no-evidence motion for summary judgment, the movant must establish that there is no evidence to support an essential element of the non-movant's claim on which the nonmovant would have the burden of proof at trial. Tex.R. Civ. P. 166a(i); *Hahn v. Love,* 321 S.W.3d 517, 523–24 (Tex.App.-Houston [1st Dist.] 2009, pet. denied); *see Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.,* 994 S.W.2d 830, 834 (Tex.App.-Houston [1st Dist.] 1999, no pet.). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to each of the elements specified in the motion. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006); *Hahn,* 321 S.W.3d at 524. "The movant 'must be specific in challenging the evidentiary support for an element of a claim or defense; paragraph (i) does not authorize conclusory motions or general no-evidence challenges to an opponent's case.'" *Hahn,* 321 S.W.3d at 524 (quoting Tex.R. Civ. P. 166a(i), 1997 cmt.).

---

5. This Court issued an order assigning this severed cause trial court cause number 2002– 62464–C, which resulted in appellate cause number 01–11–00689–CV.

"The trial court must grant the motion unless the nonmovant produces more than a scintilla of evidence raising a genuine issue of material fact on the challenged elements." *Flameout Design & Fabrication*, 994 S.W.2d at 834. More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). However, "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). In determining whether a material fact question exists, we may consider both direct and circumstantial evidence. *Ridgway*, 135 S.W.3d at 601.

To prevail on a traditional summary judgment motion, the movant has the burden of proving that he is entitled to judgment as a matter of law and that there are no genuine issues of material fact. *Tex.R. Civ. P.* 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995). Rule 166a(i), governing no-evidence summary judgment motions, "does not apply to ordinary motions for summary judgment under paragraphs (a) or (b), in which the movant must prove that it is entitled to summary judgment by establishing each element of its claim or defense as a matter of law." *Hahn*, 321 S.W.3d at 524 (quoting Tex.R. Civ. P. 166a(i), 1997 cmt.); *Brown v. Hearthwood II Owners Ass'n, Inc.*, 201 S.W.3d 153, 157–58 & n. 7 (Tex.App.-Houston [14th Dist.] 2006, pet. denied).

A defendant moving for summary judgment based on his own affirmative defense must conclusively establish each element of that defense as a matter of law. *See Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997). Therefore, to avoid summary judgment in favor of a defendant on the defendant's affirmative defense, a plaintiff must raise a fact issue as to at least one element of the defense. *See id.; City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

In reviewing the trial court's summary judgment, we take all evidence favorable to the non-movant as true, and indulge every reasonable inference in his favor. *Sci. Spectrum*, 941 S.W.2d at 911.

## SUMMARY JUDGMENTS IN FAVOR OF CARTER AND FARLEY

In its third issue, Essex contends that Carter and Farley engaged in a civil conspiracy with several of the other original defendants in the underlying suit to fraudulently transfer assets of McPherson, Sr. and the McPherson Entities out of its reach in violation of the Texas Uniform Fraudulent Transfer Act ("TUFTA"). Essex does not contend that either Carter or Farley is directly liable for violating TUFTA.[6]

In their no-evidence motions for summary judgment, Carter and Farley argued that there was no evidence that their "zealous representation of [their] former clients involved acts which are contrary to law, wrongful and harmful toward Plaintiff or were carried out by unlawful means" and that there was no evidence that they enjoyed the fruits of the transaction or that their legal fees depended upon keeping the assets from Essex.

---

**6.** Essex' brief on appeal states, "As with Beverly, Essex and Morano allege only that Carter and Farley are liable for conspiring with the McPherson Entities to fraudulently transfer assets, and not that they are directly liable for violating TUFTA."

In their traditional motions for summary judgment, Carter and Farley contended that they were entitled to summary judgment because Essex failed to plead an actionable claim against them. They argued that Essex's claims were premised on conduct undertaken by them as attorneys in the representation of their clients in litigation and that they were immune from suit by non-clients in the litigation for such conduct. Carter and Farley also contended that, even if Essex had pled an actionable claim against them for civil conspiracy, no genuine issues of material fact precluded the granting of their traditional or no-evidence motions for summary judgment on those conspiracy claims.

Essex contends that the trial court erred in rendering summary judgment in Carter and Farley's favor because (1) Essex produced more than a scintilla of evidence that Carter and Farley "knowingly participated in a conspiracy to fraudulently transfer assets out of the reach of Essex and Morano, as judgment creditors" and (2) Carter and Farley were not immune from suit for their actions in furtherance of the conspiracy.

## A. Fraudulent Transfer

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE ANN. § 24.005(a)(1) (Vernon 2009); see Nobles v. Marcus, 533 S.W.2d 923, 925 (Tex.1976); Hahn, 321 S.W.3d at 524–25.

The actual intent to defraud is shown by, among other things, evidence that the transfer was made to an insider, including a relative; the debtor retained possession or control of the transferred property after the transfer; the transfer or obligation was concealed; the debtor was sued or threatened with suit before the transfer was made or the obligation incurred; the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; the debtor was insolvent or became insolvent shortly after the transfer was made or obligation incurred; the transfer occurred shortly before or after a substantial debt was incurred; or the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. TEX. BUS. & COM.CODE ANN. § 24.005(b); see Hahn, 321 S.W.3d at 525.

The facts and circumstances set out in section 24.005(b) to be considered in determining fraudulent intent are mere "badges of fraud" and are non-exclusive. Flores v. Robinson Roofing & Constr. Co., Inc., 161 S.W.3d 750, 755 (Tex.App.-Fort Worth 2005, pet. denied). Therefore, because "fraudulent intent is only to be deduced from facts and circumstances which the law considers as mere badges of fraud, and not fraud per se, these must be submitted to the trier of fact, which draws the inference as to the fairness or fraudulent character of the transaction." Id. (quoting Coleman Cattle Co. v. Carpentier, 10 S.W.3d 430, 434 (Tex.App.-Beaumont 2000, no pet.)); see also Quinn v. Dupree, 157 Tex. 441, 303 S.W.2d 769, 774 (1957). Thus, "[t]he question of whether a debtor conveyed property with the intent to defraud creditors is 'ordinarily a question for the jury or the court passing on the fact.'" Flores, 161 S.W.3d at 755 (quoting Coleman Cattle Co., 10 S.W.3d at 433); see also Equitable Trust Co. v. Roland, 644 S.W.2d 46, 51 (Tex.App.-San Antonio 1982, writ ref'd n.r.e.) (pointing out that trial court's decision to grant instructed verdict on fraudulent conveyance issues "was in

contradiction of the general rule that the existence of a fraudulent conveyance is a question for the trier of the facts"). "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." Flores, 161 S.W.3d at 755.

■ A transfer to an insider is one of the factors in proving actual intent to defraud under TUFTA. *See* Tex. Bus. & Com.Code Ann. § 24.005(b)(1). An "insider" includes, if the debtor is an individual, a relative of the debtor, a general partner of the debtor, or a partnership in which the debtor is a general partner. *Id.* § 24.002(7)(A) (Vernon 2009). If the debtor is a corporation, an "insider" includes, among others, an officer of the debtor, a person in control of the debtor, or a relative of a general partner, director, officer, or person in control of the debtor. *Id.* § 24.002(7)(B). Insider status is not limited, however, to persons in the capacities listed in section 24.002(7); rather, the lists in subsections 24.002(7)(A) and (B) are provided "for purposes of exemplification." *Hahn,* 321 S.W.3d at 525 n. 8; *Putman v. Stephenson,* 805 S.W.2d 16, 18 (Tex.App.-Dallas 1991, no writ). In general, an "insider" is a person or "an entity whose close relationship with the debtor subjects any transactions made between the debtor and the insider to heavy scrutiny." *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.,* 80 S.W.3d 601, 609 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

■ In determining insider status, courts are to consider (1) the closeness of the relationship between the transferee and the debtor and (2) whether the transactions were at arm's length. *Id.* (citing *In re Holloway,* 955 F.2d 1008, 1010 (5th Cir.1992)). However, it is not necessary to prove that a transferee is an insider in order to prove the transferee's knowledge

of the transferor's fraudulent intent. *See* Tex. Bus. & Com.Code Ann. § 24.005(b); *Hahn,* 321 S.W.3d at 525 n. 8; Flores, 161 S.W.3d at 755. If "fraudulent intent is only to be deduced from facts and circumstances which the law considers as mere badges of fraud and not fraud per se, these must be submitted to the trier of fact, which draws the inference as to the fairness or fraudulent character of the transaction." *Flores,* 161 S.W.3d at 754 (quoting *Coleman Cattle Co.,* 10 S.W.3d at 434).

**B. Conspiracy to Commit Fraudulent Transfer**

Carter and Farley contend that (1) there is no evidence that they either committed a fraudulent transfer themselves or conspired to commit a fraudulent transfer and (2) their actions were all undertaken in representation of their clients in litigation, entitling them to immunity from suit for conspiracy to commit a fraudulent transfer.

■ "Conspiracy is a derivative tort requiring an unlawful means or purpose, which may include an underlying tort." *Chu v. Hong,* 249 S.W.3d 441, 444 (Tex. 2008); *see also Gary E. Patterson & Assocs. v. Holub,* 264 S.W.3d 180, 204 (Tex. App.-Houston [1st Dist.] 2008, pet. denied). Thus, to negate summary judgment on a conspiracy claim in a fraudulent transfer case, there must be some evidence of the movant's participation in a conspiracy to commit a fraudulent transfer. *See Chu,* 249 S.W.3d at 444.

■ An attorney for an opposing party may not be held liable for breach of fiduciary duty or fraud merely for making representations to the opposing party in litigation that further the best interests of his own clients. *Id.* at 446 & n. 19; *McCamish, Martin, Brown, & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 794 (Tex.1999); *Alpert v. Crain, Caton &*

*James, P.C.,* 178 S.W.3d 398, 406 (Tex. App.-Houston [1st Dist.] 2005, pet. denied); *see also Finserv Cas. Corp. v. Settlement Funding, LLC,* 724 F.Supp.2d 662, 671 (S.D.Tex.2010). However, "[a]n attorney who personally ... tells lies on a client's behalf may be liable for ... fraud in some cases." *Chu,* 249 S.W.3d at 446. Thus, an attorney may be held liable for conspiracy to defraud by knowingly assisting a client in evading a judgment through a fraudulent transfer. *See id.* at 446 & n. 19; *Estate of Stonecipher v. Estate of Butts,* 686 S.W.2d 101, 103 (Tex.1985); *Likover v. Sunflower Terrace II, Ltd.,* 696 S.W.2d 468, 472 (Tex.App.-Houston [1st Dist.] 1985, no writ) (holding that "[a]n attorney is liable if he knowingly commits a fraudulent act that injures a third person, or if he knowingly enters into a conspiracy to defraud a third person" in the course of representing his client). In order to be held liable for conspiracy to defraud by so assisting his client, however, the attorney must have agreed to the injury to be accomplished, not merely the conduct ultimately resulting in injury. *Chu,* 249 S.W.3d at 446–47.

### 1. Evidence of Conspiracy to Commit a Fraudulent Transfer

In their no-evidence motions for summary judgment, Carter and Farley contend they could be liable for conspiracy only if they agreed to the injury to be accomplished; inferring an agreement as to the ultimate injury generally arises "from joint participation in the transactions and from enjoyment of the fruits of the transactions"; there is no evidence of an agreement or meeting of the minds between themselves and any other party to this suit to "fraudulently transfer, hide, secret or otherwise conceal assets with the intent to avoid payment of the debt" to Essex, to its harm; and there is no evidence that they enjoyed the fruits of the transaction or that their legal fees depended upon keeping the assets from Essex.

Essex contends that the record reveals that both Carter and Farley were intertwined in the transaction between HII and the McPherson Entities and that genuine issues of material fact exist as to whether Carter and Farley had a "meeting of the minds" with the McPherson Entities to assist in the transfer and shelter of assets from possible seizure by the McPherson Entities' creditors, to its harm, making both no-evidence and traditional summary judgment improper.

Specifically, Essex points to evidence that:

- Carter and Farley represented the McPherson Entities in earlier proceedings beginning in the late 1990s when Farley worked as an attorney for Carter's law firm;
- Farley incorporated HII in March 2002;
- Carter served as HII's registered agent;
- McPherson, Jr. was the owner and sole managing member of HII;
- eight weeks after HII was incorporated, Carter and Farley negotiated with the Fund and the Facility to acquire an assignment of their rights in the Settlement Agreement for $275,000 for HII;
- Carter and Farley drafted the assignment;
- after the assignment, HII, represented by Farley, took final judgments against McPherson, Sr. and the McPherson Entities for $3.5 million;
- Carter represented McPherson, Sr. and the McPherson Entities in those proceedings; and
- Carter testified that the assignment was done as a form of "estate planning," specifically, to create a friendly

creditor-debtor relationship between McPherson, Jr.'s company and McPherson, Sr.'s entities.

Essex further contends that it can be logically inferred that Carter and his client discussed and were in agreement as to whether McPherson, Sr. would agree to pay the $3.5 million judgment entered against him and his companies by his son's company, HII. Essex also contends that when asked if Carter and McPherson, Sr. had agreed on this course of action Carter deferred to McPherson, Sr., who asserted the attorney-client privilege. According to Essex, to the extent that it had been unable to produce an admission of this agreement between Carter and McPherson, "it is only because of Defendant's use of the attorney-client privilege." Essex further contends that the fact that there was no legal basis for the Agreed Judgments is further circumstantial evidence of conspiratorial intent.

We conclude that Essex has produced evidence sufficient to raise a material fact issue on each of the elements of fraudulent transfer, including several of the "badges of fraud" that form the basis for a finding of intent to defraud under TUFTA. *See* FEX. BUS. & COM.CODE ANN. §§ 24.005(a)(1), (b); *Flores*, 161 S.W.3d at 755. Specifically, it has produced summary judgment evidence from which a jury could reasonably infer that Carter and Farley, acting as attorneys for McPherson, Sr., McPherson, Jr., and the McPherson Entities, and with the specific intent of protecting McPherson, Sr.'s and the McPherson Entities' assets from collection by Essex, negotiated and executed the Assignment of the Fund's and the Facility's right to payment by McPherson, Sr. and the McPherson Entities under the TWC Settlement Agreement to an insider, HII, a newly formed corporation entirely owned and controlled by McPherson, Jr. Also, HII's

documents of incorporation were drawn up by Farley, and Carter served as registered agent. McPherson, Jr. testified that HII was created to separate its assets from his own and that he sought the Assignment to HII "in order to protect [his] assets."

Carter and Farley drafted an Assignment of the Fund's and the Facility's rights under the TWC Settlement Agreement to HII. They drafted Agreed Judgments under which the McPherson Entities and HII agreed that the McPherson Entities would pay the entire original amount of the satisfied debt, in the amount of $3,147,844, to HII. They then filed the Agreed Judgments they had drafted with the Travis County district court without informing the court that the Assignment was of a previously satisfied debt as to which the assignor retained no right of payment and that the Assignment had been made to an insider controlled by a relative of the debtor. They promptly proceeded to execute the judgments against the McPherson Entities, removing from Essex's reach assets otherwise available to satisfy the judgment lien it had placed on the transferred assets. McPherson, Sr. testified that HII took the Agreed Judgments to help out the family. He also testified that the plan was discussed with Carter.

Each of these facts and circumstances constitutes a "badge of fraud." *See* TEX. BUS. & COM.CODE ANN. § 24.005(b); *Hahn*, 321 S.W.3d at 525; *Flores*, 161 S.W.3d at 755. Because "fraudulent intent is only to be deduced from facts and circumstances which the law considers badges of fraud, these must be submitted to the trier of fact, which draws the inference as to the fairness or fraudulent character of the transaction." *Flores*, 161 S.W.3d at 755 (quoting *Coleman Cattle Co.*, 10 S.W.3d at 434); *see also Quinn*, 303 S.W.2d at 774.

We conclude that Essex has raised fact issues regarding Carter's and Farley's participation in a conspiracy to hide their clients' assets in order to effect injury upon Essex by drafting the legal documents and taking the legal actions that effected the transfer of McPherson, Sr.'s and the McPherson Entities' assets to HII that placed them beyond the reach of Essex. We further conclude that Essex has raised a fact issue as to whether Carter and Farley promoted the scheme to earn a fee for themselves that they would not have earned had they not assisted McPherson, Sr. in a fraudulent transfer McPherson's assets to protect them from creditors such as Essex.

Thus, we hold that Essex has raised material fact issues as to Carter's and Farley's knowing participation in a conspiracy to defraud.

We sustain the first part of Essex's third issue.

### 2. Attorney Immunity

■ In their traditional motions for summary judgment, Carter and Farley contend that, because their actions with respect to McPherson, Sr. and the McPherson Entities at issue were undertaken in their capacity as counsel for those clients to advance their best interests in the litigation context, they are immune from liability for their actions. Carter and Farley rely on *Chu* to support their claim to immunity from liability for conspiracy to violate TUFTA. *See* 249 S.W.3d at 447.

Because immunity is an affirmative defense, we review the summary judgment in Carter and Farley's favor on this issue under the standard of review for traditional summary judgments to determine whether Carter and Farley established their affirmative defense as a matter of law or whether Essex has raised a material fact issue as to at least one element of the defense. *See* Tex.R. Civ. P. 166a(c), (i) & 1997 cmt.; *see also Mendoza v. Fleming*, 41 S.W.3d 781, 787 (Tex.App.-Corpus Christi 2001, no pet.) (holding appellees failed to establish affirmative defense of attorney immunity as matter of law because material fact issue existed concerning whether appellees' actions were within bounds of law); *cf. Lackshin v. Spofford*, No. 14-03-00977-CV, 2004 WL 1965636, at *5 (Tex.App.-Houston [14th Dist.] Sept. 7, 2004, pet. denied) (mem. op.) (holding trial court did not err in granting traditional summary judgment in appellee's favor because summary judgment evidence conclusively proved that appellee's allegedly actionable conduct occurred during his legal representation of client and appellant failed to allege sufficient facts to show that appellee's alleged conduct fell within an exception to this affirmative defense).

We hold that Carter and Farley's reliance on *Chu* to support their immunity defense is misplaced.

*Chu* did not hold that attorneys are immune to suit for fraudulent acts undertaken in the representation of a client; it indicated exactly the opposite. *See* 249 S.W.3d at 446 & n. 19. In *Chu*, the supreme court commented, "An attorney who personally steals goods or tells lies on a client's behalf may be liable for conversion or fraud in some cases." *Id.; see also Poole v. Houston & T.C. Ry. Co.*, 58 Tex. 134, 137-38 (1882) (holding that attorney who fraudulently diverted goods to evade lawful seizure by creditor "will not be heard to deny his liability to appellant for the loss sustained by reason of his wrongful acts, under the privileges of an attorney at law, for such acts are entirely foreign to the duties of an attorney; neither will he be permitted, under such circumstances, to shield himself from liability on the ground that he was the agent of [his client], for no one is justified on that

ground in knowingly committing willful and premeditated frauds for another").

In *Chu*, the supreme court held that a buyer's attorney could not be held liable for drawing up a bill of sale of community property, a shop, at his client's request when he knew that the seller was selling the shop without his spouse's consent. 249 S.W.3d at 446. It reasoned that the buyer's attorney had a fiduciary duty to further the best interests of his client, the buyer, and imposing on him a second duty to the sellers "would inevitably conflict with the first." *Id.; see also Finserv Cas. Corp.*, 724 F.Supp.2d at 671, 674 (quoting *Chu's* statement that "[a]n attorney who personally steals goods or tells lies on a client's behalf may be liable for conversion or fraud in some cases," but concluding that facts of instant case were "not the type of situation indicated in *Chu*," which "all dealt with conspiracies to defraud," and thus upholding attorney's immunity to claim of conversion by opposing party in litigation); *Alpert*, 178 S.W.3d at 405–06 (holding that defendant attorney was immune from liability for actions in representation of client sued upon, but stating that "[i]f a lawyer participates in independently fraudulent activities, his action is 'foreign to the duties of an attorney'" and that "[a] lawyer thus cannot shield his own willful and premeditated fraudulent actions from liability simply on the ground that he is an agent of his client") (quoting *Poole*, 58 Tex. at 137); *Lackshin*, 2004 WL 1965636, at *3 (concluding, after review, that complained of conduct was not fraudulent or malicious, but stating, "If defendants prove as a matter of law that their allegedly actionable conduct was undertaken in the representation of a third-party client, then they have shown their entitlement to summary judg-

ment on all claims, *except for alleged torts based on fraudulent or malicious conduct*" (emphasis added)); *cf. McCamish, Martin, Brown & Loeffler*, 991 S.W.2d at 794 (recognizing qualified attorney immunity for representations made in adversarial context).

■ Here, Essex has not sued Carter and Farley for their representations to it or for their lawful actions within the scope of their professional duty to represent McPherson, Sr. and the McPherson Entities in this litigation. It has sued them for their actions in allegedly drafting and filing fraudulent legal documents for the purpose of conspiring to hide their clients' assets from judgment creditors in violation of TUFTA. Attorneys have no immunity from knowingly drafting fraudulent documents to evade the lawful seizure of property by a judgment creditor, and they may not deny their liability to the judgment creditor for the loss sustained by reason of their own wrongful acts on the ground that they are the agents of their clients, "for no one is justified on that ground in knowingly committing willful and premeditated frauds for another." *Poole*, 58 Tex. at 137–38; *see also Chu*, 249 S.W.3d at 446 & n. 19; *Alpert*, 178 S.W.3d at 406; *Likover*, 696 S.W.2d at 472. We sustain the second part of Essex's third issue and hold that Essex has raised a material fact issue as to whether Carter and Farley are immune from their actions made the subject of this litigation.

We therefore hold that the trial court erred in entering summary judgment in favor of Carter and Farley on their affirmative defense of attorney immunity.[7]

We sustain Essex's third issue.

---

7. Essex also alleges, and Carter and Farley deny, that Carter and Farley's summary judgment motion regarding damages was procedurally defective. Because we have concluded that the summary judgment must be reversed, we do not reach this issue.

## SUMMARY JUDGMENTS IN FAVOR OF BEVERLY

Essex contends that the trial court (1) improperly sustained Beverly's objections to its summary judgment evidence, (2) erroneously rendered a no-evidence summary judgment in favor of Beverly, and (3) erroneously granted Beverly's motion to quiet title in the absence of any actual cloud on the title arising from any actions by Essex. We agree.

### A. Beverly's Objections to Essex's Summary Judgment Evidence

■ In its first issue, Essex contends that the trial court improperly sustained Beverly's objections to the summary judgment evidence it filed in response to Beverly's no-evidence motion for summary judgment because the objections were not filed until after the court had granted Beverly's motion, and they were, therefore, waived.

■ To preserve objections to summary judgment evidence for appeal, a party asserting the objections must obtain a ruling at or before the summary judgment hearing. "As a prerequisite to presenting a complaint for appellate review, the record must show that ... the complaint was made to the trial court by a timely request, objection, or motion...." TEX.R.APP. P. 33.1(a)(1); see TEX.R. CIV. P. 166a(f) (stating, "Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend"); *Hogan v. J. Higgins Trucking, Inc.*, 197 S.W.3d 879, 883 (Tex.App.-Dallas 2006, no pet.); *see also McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 343 n. 7 (Tex.1993) (holding that all issues must be expressly presented to trial court). Summary judgment evidence must be presented in a form that would be admissible at trial.

*See, e.g., Vice v. Kasprzak*, 318 S.W.3d 1, 11 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). If a party has objections to defects in the form of supporting attachments, those objections must be made in writing and placed before the trial court, or the objections will be waived. *See* Tex.R. Civ. P. 166a(f); *Grand Prairie Indep. Sch. Dist. v. Vaughan*, 792 S.W.2d 944, 945 (Tex.1990). A party's failure to secure a ruling on an objection also waives the issue on appeal. *See, e.g., Vice*, 318 S.W.3d at 11.

Here, the trial court granted Beverly's no-evidence motion for summary judgment by order entered on August 15, 2007, following a hearing on August 13. On August 27, 2007, Essex filed a motion to reconsider the summary judgments rendered in Carter's and in Beverly's favor. On September 4, 2007, Beverly filed his "Objections to Evidence Cited in Plaintiffs' Response to No–Evidence Motion for Summary Judgment." On September 24, the trial court denied Essex's motion to reconsider. On September 26, the trial court signed an order granting Beverly's objections to Essex's summary judgment evidence in their entirety. Because Beverly's objections were untimely filed *after* summary judgment had been entered on his claims and the trial court refused to reconsider its ruling granting the summary judgment, the trial court's order granting Beverly's untimely filed objections to the summary judgment evidence was erroneous. *See* Tex.R.App. P. 33.1(a)(1); *Hogan*, 197 S.W.3d at 883.

We sustain Essex's first issue.

### B. Beverly's No–Evidence Motion for Summary Judgment

■ Essex also contends that the trial court erred in granting Beverly's no-evidence motion for summary judgment because (1) it produced more than a scintilla

of evidence supporting its conspiracy claim, (2) Beverly's motion was procedurally inadequate, and (3) Beverly's legal arguments lacked foundation.

Beverly filed a no-evidence motion for summary judgment in which he alleged that there was no evidence that (a) McPherson, Sr. transferred the Montgomery House in violation of TUFTA; (b) the Montgomery House was an "asset" as defined by TUFTA; (c) Beverly's purchase of the promissory notes and lien securing the Montgomery House constituted a fraudulent transfer; (d) Beverly's purchase of the Montgomery House was through a collusive or "sham" foreclosure, or was an illegal object of a conspiracy; (e) Beverly's purchase of the house prior to foreclosure violated TUFTA; (f) Beverly's rental of the Montgomery House to McPherson was an illegal object of a conspiracy; (g) McPherson's payment of $150,000 to Beverly "the day before [the $150,000] lost its exempt status as homestead proceeds" constituted fraudulent transfer of an asset; (h)-(i), and (k) Beverly conspired to violate TUFTA; (j) and (*l*) "Plaintiffs possessed a final judgment or a valid lien as alleged . . ., an essential element of conspiracy to interfere with collection of a debt" because "[w]ithout a valid lien, Plaintiffs were no more than general creditors" and "[a] general creditor has no claim for conspiracy for fraudulent transfer"; (m) Essex "had any interest in any claims or judgment against [McPherson, Sr.] after Essex's assignment on March 28, 2002 to Morano, Inc. [a related entity]," (n) Essex "ever had an interest in any receivable, claim or judgment against Coastal Terminal Operators, Inc."; or (o) Essex "had any interest in any claims or judgment against [McPherson, Sr.] at the time of the $150,000 payment to Beverly." We construe Beverly's motion as a hybrid motion for summary judgment alleging essentially that there was no evidence of an underlying wrongful act to support a claim against Beverly for conspiracy to violate TUFTA and no evidence that Essex had standing to bring its claim against Beverly.

### 1. Beverly's Participation in a Conspiracy to Violate TUFTA

Essentially, Beverly alleged, first, that Essex had failed to raise a genuine issue of material fact as to the existence of a conspiracy to violate TUFTA and as to his specific intent to conspire to violate TUFTA. The summary judgment evidence shows that, at the time of the Essex Judgments, McPherson, Sr. owned the Montgomery House. Essex obtained a lien on the Montgomery House in McPherson, Sr.'s name through the filing of an abstract of judgment relating to the Essex Judgments. After entry of these judgments, McPherson defaulted on his loan on the Montgomery House. Prior to foreclosure, Beverly, who had been McPherson Sr.'s accountant since 1989 or 1990 and who was also a long-time friend, purchased the bank note and lien on the property and took a second lien on the Montgomery House without ever seeing the property, thereby extinguishing Essex's judgment lien.

McPherson, Sr. was living in the house and was never forced to move out. Instead, Beverly rented the Montgomery House back to McPherson, Sr. and his family. McPherson, Sr., either personally or through one of the McPherson Entities, paid monthly rent on the home and reimbursed Beverly for taxes and homeowners insurance costs, even though he no longer owned the property. Following the sale of his homestead in Harris County, McPherson, Sr. attempted to use the proceeds from that sale to buy back the Montgomery House and to designate the Montgomery House as his homestead to protect it from seizure. However, Stewart Title de-

clined to issue a title policy for McPherson, Sr.'s repurchase because McPherson, Sr. was the same person who had owned the property prior to the sale of the house to Beverly. On December 22, 2005, around the time that the proceeds from the sale of McPherson, Sr.'s Harris County homestead property were to lose their statutory exemption from execution, McPherson, Sr. wire-transferred $150,000 to Beverly, claiming that the payment was intended for the repurchase of the Montgomery House despite the fact that the wire transfer occurred after the scheduled closing date for the sale of the Montgomery House. Because the resale did not occur, title to the Montgomery House remains in Beverly's name.

We hold that the evidence is sufficient to raise a material fact issue as to whether Beverly, McPherson, Sr.'s accountant and long-time friend, had the specific intent to conspire to defraud Essex by assisting McPherson, Sr. in evading payment of the Essex Judgments through fraudulent transfers of McPherson, Sr.'s assets. *See* TEX. BUS. & COM.CODE ANN. § 24.005(b) (listing as indicia of intent to defraud, *inter alia,* whether debtor retained possession or control of property transferred after transfer, debtor was sued or threatened with suit before transfer was made, debtor removed or concealed assets, value of consideration received by debtor was reasonably equivalent to value of asset transferred, debtor was insolvent or became insolvent shortly after transfer was made, transfer occurred shortly before or after substantial debt was incurred, and debtor transferred essential assets of business to lien or who transferred assets to insider of debtor). We further hold that the evidence is sufficient to present a material

fact issue as to whether Beverly agreed not merely with the conduct that resulted in the injury—the transfer of assets subject to Essex's judgment lien—but with the injury to Essex to be accomplished, i.e., evasion of payment of the judgment from assets subject to the lien. *See Chu,* 249 S.W.3d at 446–47 & n. 19; *Stonecipher,* 591 S.W.2d at 808.

We hold that Essex has raised a material fact issue on each of the elements of its claim against Beverly for conspiracy to violate TUFTA. The trial court, therefore, erred in granting Beverly's no-evidence motion for summary judgment on this ground.

## 2. *Essex's Standing*

Beverly also argues that Essex produced no evidence that it is a judgment creditor of McPherson, Sr. and the McPherson Entities. His only argument is that Essex lacked a valid judgment lien against the Montgomery House, which he argues is an essential element of a fraudulent transfer claim when the party asserting the fraudulent transfer would otherwise be a mere general creditor of the judgment debtor. Beverly argues that Essex produced no evidence of its judgment lien in response to his no-evidence motion for summary judgment.

■■■ Essex produced its abstract of judgment, which created a lien on McPherson, Sr.'s Montgomery House. Beverly argues, however, that because that lien was extinguished by his purchase of the house, Essex is no longer a judgment creditor, but merely a general creditor of McPherson, Sr., and that he cannot be held liable to a general creditor for conspiracy to violate TUFTA.[8]

8. Appellees Carter, Farley, and Beverly all argue that Essex's judgment lien was not valid because, although Essex obtained and filed an abstract of judgment after the judgments were entered, these summary judgments in Essex's favor were determined by the Four-

To show its standing to bring its fraudulent conspiracy claim against Beverly, Essex had only to prove that it had a right in McPherson, Sr.'s property that existed at the time of the allegedly fraudulent transfer of McPherson, Sr.'s assets to place them beyond the reach of creditors, or that arose within a reasonable time thereafter, and that Beverly was a direct or indirect transferee of the property. *See* TEX. BUS. & COM.CODE ANN. § 24.005(a); *Stonecipher's Estate v. Butts Estate*, 591 S.W.2d 806, 808–10 (Tex.1979); *see also Flores*, 161 S.W.3d at 757 (holding that evidence raising fact issue as to whether plaintiffs were creditors of debtor at time of alleged fraudulent transfer and whether debtor made transfer with actual intent to hinder, delay, or defraud plaintiffs was sufficient to preclude summary judgment against plaintiffs).

Beverly cites to *Stonechipher's Estate* as support for his claim that Essex had no judgment lien on the Montgomery House at the time this suit was filed, as is required for standing to sue for conspiracy to defraud under TUFTA for denial of a property right. Therefore, Beverly argues, Essex lacked standing to sue him for conspiracy to violate TUFTA. *Stonecipher's Estate*, however, supports Essex's standing to sue Beverly for conspiracy to violate TUFTA, not the opposite. *See* 591 S.W.2d at 808–10.

In *Stonecipher's Estate*, Stonecipher obtained a $21,000 judgment against the

Butts in 1950 but was only able to collect $5,000. *Id.* at 807. The Butts conveyed some land to their banker, Newman, for $6,000 shortly before the trial and used that money to pay off loans and to live on. *Id.* Stonecipher did not extend its judgment against the Butts, and it became dormant in 1961. *Id.* In 1970, Stonecipher discovered that Newman had conveyed the property back to the Butts in 1967. *Id.* He brought an action against the Butts and Newman in 1971, alleging that a conspiracy prevented him from collecting the judgment lien and that the defendants' fraud tolled the running of limitations. *Id.* The Texas Supreme Court observed that "courts throughout the United States have long recognized a cause of action for damages for a post-judgment conspiracy to prevent the collection of a judgment lien." *Id.*

The court observed, "A creditor with a lien has a right of action against persons who interfere with the property of his debtor upon which he has a lien, so as to prevent the levy or sale by the sheriff to satisfy his judgment." *Id.* at 808. It reasoned that "[t]he damage in a conspiracy for fraudulent conveyance is the interference with or loss of a property right or lien of the creditor in the debtor's property." *Id.* It held "that a judgment creditor, with a lien on the property made the basis of a cause of action for conspiracy to prevent the collection of such lien, may recover such damages as result from the conspira-

---

teenth Court of Appeals in 2004—after the sale of the Montgomery House to Beverly—not to have been final judgments, but interlocutory judgments, because the summary judgments did not state that they disposed of all claims, causing the appeal to be abated for entry of final judgment. *See Coastal Terminal Operators v. Essex Crane Rental Corp.*, No. 14–02–00627–CV, 2004 WL 1795355 (Apr. 08, 2005, pet.denied) (op. on reh'g). Appellees have presented no argument or authority to support their claim that the subsequent deter-

mination that the summary judgments in Essex's favor were interlocutory and the abatement of the appeal of the summary judgments for entry of final judgments retroactively invalidated Essex's judgment lien, which existed at the time of McPherson, Sr.'s transfer of the Montgomery House to Beverly, depriving Essex of standing to assert its TUFTA claims to the extent its standing depends upon the existence of its judgment lien on the house at that time. This argument is, therefore, waived for inadequate briefing. *See* TEX.R.APP. P. 38.1(f).

cy." *Id.* The court further held that the Butts' fraud tolled the statute of limitations on the judgment lien that had been extinguished, and it remanded the case to the trial court to determine whether Stonecipher used reasonable diligence in attempting to discover assets of the judgment debtors. *Id.* at 809–10.

The situation in this case is much the same. Here, Essex obtained a judgment lien against McPherson, Sr.'s Montgomery House. However, McPherson, Sr. defaulted on the mortgage loan on the house. Before foreclosure, the bank note and the bank's lien on the property were sold by the mortgage lender to Beverly, McPherson, Sr.'s friend and accountant, and title was transferred to Beverly, extinguishing Essex's judgment lien on McPherson, Sr.'s property. Under *Stonecipher's Estate*, however, a lien extinguished by fraud satisfies the "property right or lien" element of a claim of conspiracy to commit fraud. *See id.* at 808–09 (stating, "fraud vitiates whatever it touches"). Therefore, Essex's lack of an enforceable lien against the Montgomery House at the time suit was filed is no bar to its suit against Beverly, assuming the suit was timely brought or that "reasonable diligence was exercised to discover assets of the judgment debtors," as it was. *See id.* at 810; *see also Hollins v. Rapid Transit Lines, Inc.,* 440 S.W.2d 57, 59–60 (Tex.1969) (tort claimant not required to obtain judgment before bringing action under fraudulent conveyance statute); *Eckert v. Wendel,* 120 Tex. 618, 40 S.W.2d 796, 797 (1931) (declaring that "a creditor, though he have no specific lien, may maintain an action in equity to vacate a fraudulent conveyance of his debtor's land").

The Fifth Circuit case of *Mack v. Newton,* which relied on *Stonecipher's Estate,* is also instructive. 737 F.2d 1343 (5th Cir.1984). This was a trustee's suit against a debtor's principals and lender seeking recovery on the basis of civil conspiracy, conversion, fraudulent conveyances, and usury. *Id.* at 1346–47. The bank was a financing bank that held the mortgage on cattle transferred from the debtor to an insider of the debtor, a transferee company. *Id.* at 1347–48. Citing *Stonecipher's Estate,* the Fifth Circuit held that the bank could not be held liable for civil conspiracy to defraud because the bank was a general creditor of the debtor and there was no provision in TUFTA "for recovery other than recovery of the property transferred or its value from one who is, directly or indirectly, a transferee or recipient thereof." *Id.* at 1361. Here, by contrast, Beverly was the transferee of the note and lien on the Montgomery House and is still the owner of the house, for which he has received value from McPherson, Sr. Thus, he is subject to suit by Essex under the rule set out in *Stonecipher's Estate* and *Mack* as a direct participant in an alleged conspiracy to defraud Essex of its rights in McPherson, Sr.'s property in violation of TUFTA.

We hold that Beverly has failed to carry his burden of showing, as a matter of law, that Essex lacks standing to sue Beverly for conspiracy to violate TUFTA. The trial court, therefore, erred in entering no-evidence summary judgment in Beverly's favor.

We sustain Essex's second issue.

**C. Beverly's "Motion to Clear Beverly's Title"**

On July 23, 2007, Beverly filed a "Motion for Partial Summary Judgment on Lien Element of Conspiracy to Commit Fraudulent Transfer" that also included a "Motion to Quiet Title" to the Montgomery House. The trial court did not grant the motion for partial summary judgment, but it granted Beverly's motion to quiet title on September 24, 2007.

In its fourth issue on appeal, Essex contends that the trial court erred in granting Beverly's motion to quiet title because (1) the motion was not properly pending before the court since Essex was never given notice of a hearing on the motion, and (2) the motion for partial summary judgment predicated the ruling lifting the cloud on Beverly's title on a finding by the trial court that Essex's judgment lien on the Montgomery House was void—a finding that the trial court never made.

■■■■■ A suit to clear title or quiet title—also known as a suit to remove cloud from title—relies on the invalidity of the defendant's claim to the property. *Longoria v. Lasater,* 292 S.W.3d 156, 165 n. 7 (Tex.App.-San Antonio 2009, pet. denied). It exists "to enable the holder of the feeblest equity to remove from his way to legal title any unlawful hindrance having the appearance of better right." *Bell v. Ott,* 606 S.W.2d 942, 952 (Tex.Civ.App.-Waco 1980, writ ref'd n.r.e.) (quoting *Thomson v. Locke,* 66 Tex. 383, 1 S.W. 112, 115 (1886)); *see also Hahn,* 321 S.W.3d at 531 (quoting *Bell,* 606 S.W.2d at 952). "A cloud on title exists when an outstanding claim or encumbrance is shown, which on its face, if valid, would affect or impair the title of the owner of the property." *Hahn,* 321 S.W.3d at 531. The effect of a suit to quiet title is to declare invalid or ineffective the defendant's claim to title. *See id.; Bell,* 606 S.W.2d at 952 (holding that quiet title enables holder of feeblest equity to remove unlawful hindrance). "[T]he plaintiff has the burden of supplying the proof necessary to establish his superior equity and right to relief." *Hahn,* 321 S.W.3d at 531; *see Bell,* 606 S.W.2d at 952. The plaintiff must prove, as a matter of law, that he has a right of ownership and that the adverse claim is a cloud on the title that equity will remove. *Hahn,* 321 S.W.3d at 531.

Beverly moved for partial summary judgment on the ground that "[t]o prove conspiracy to interfere with collection of a debt, Plaintiffs must have had a valid lien," and he contended that Essex did not have a valid lien against the Montgomery House. The trial court never made the finding on which Beverly's suit to quiet title was predicated, namely that Essex lacked a valid lien on the Montgomery House, and, as stated above, the present existence of a valid judgment lien at the time suit is filed is not a necessary element of a claim for conspiracy to violate TUFTA. *See* TEX. BUS. & COM.CODE ANN. § 24.002(3)-(4). Moreover, Beverly did not supply "the proof necessary to establish his superior equity and right to relief," as required to support judgment in the plaintiff's favor in a suit to quiet title. *Hahn,* 321 S.W.3d at 531; *see also Bell,* 606 S.W.2d at 952.

We hold that the trial court's order quieting title to the Montgomery House was arbitrary and unreasonable and thus was an abuse of discretion. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985) (stating, "The test for abuse of discretion is ... whether the court acted without reference to any guiding rules and principles" or was "arbitrary and unreasonable").

We hold that the trial court erred in granting Beverly's motion to quiet title, which was predicated in Beverly's summary judgment pleadings on proving his entitlement to summary judgment on "the lien element of conspiracy to commit fraudulent transfer."

We sustain Essex's fourth issue.

## CONCLUSION

We reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

Justice SHARP, dissenting in part.

JIM SHARP, Justice, dissenting opinion.

I withdraw my dissenting and concurring opinion dated August 25, 2011 and substitute this opinion in its stead. Because I would affirm the trial court's granting of Carter's and Farley's no-evidence motions for summary judgment, I continue to respectfully dissent.

To prevail on a no-evidence motion for summary judgment, the movant must establish that there is no evidence to support an essential element of the non-movant's claim. Tex.R. Civ. P. 166a(i); *see Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex. App.-Houston [1st Dist.] 1999, no pet.). Thereafter, the burden shifts to the non-movant to present evidence raising a genuine issue of material fact as to the elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex.2006). "The trial court must grant the motion unless the non-movant produces more than a scintilla of evidence raising a genuine issue of material fact on the challenged elements." *Flameout Design & Fabrication*, 994 S.W.2d at 834. More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). However, "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). In determining whether a material fact exists, we may consider both direct and circumstantial evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). "To raise a genuine issue of material fact, however, the evidence must transcend mere suspicion." *Id.* "Evidence that is so slight as to make any inference a guess is in legal effect no evidence." *Id.*

***Is there a genuine issue of material fact that precludes the granting of Carter's and Farley's no-evidence motions for summary judgment?***

Carter's and Farley's no-evidence motions for summary judgment contend that there is no evidence of an agreement or meeting of the minds between themselves or anyone else to "fraudulently transfer, hide, secret or otherwise conceal assets with the intent to avoid payment of the debt" to Essex.

Citing to *Chu v. Hong*, 249 S.W.3d 441, 447 (Tex.2008), Carter and Farley note that they could only be liable for conspiracy if they agreed to the injury to be accomplished. Inferring an agreement as to the ultimate injury, they contend, generally arises "from joint participation in the transactions and from enjoyment of the fruits of the transactions" and in this case, there exists no evidence that they enjoyed the fruits of the transaction or that their legal fees depended upon keeping the assets from Essex or any of the McPherson Entities' other creditors. Essex contends that the evidence supports the conclusion that Carter and Farley did agree to the injury to be accomplished because the purpose and intent behind their actions was to hide assets from creditors—the exact injury alleged.[1] Essex further contends that

---

1. Essex also replied that because neither Carter nor Farley raised a no-evidence challenge as to whether they "enjoyed the fruits of the transaction" or agreed to the ultimate injury, they are precluded from relying on these arguments on appeal. Whether Carter or Farley "enjoyed the fruits of the transaction" or agreed to the ultimate injury, however, goes to the issue of conspiratorial intent. Both Carter and Farley challenged Essex's evi-

genuine issues of material fact exist as to whether Carter and Farley had a "meeting of the minds" with the McPherson Entities to assist in the transfer and shelter of assets from possible seizure by the McPherson Entities' creditors, making a no-evidence summary judgment improper. In support, Essex argues that it can be "logically inferred" from the evidence (which is extensively discussed in the majority opinion and, therefore, need not be repeated here) that Carter and Farley agreed to help the McPherson Entities hide assets from Essex and other creditors.

After reviewing the record in its entirety, it is apparent to me that Essex has failed to set forth any evidence, circumstantial or direct, that Carter and Farley discussed the idea of defrauding the McPherson Entities' creditors, much less that they agreed to it, or that Carter and Farley had the requisite conspiratorial intent to defraud Essex or any of the other creditors. At most, Essex has produced some evidence that Carter and Farley agreed or intended to engage in the *conduct* that resulted in the injury, which is not sufficient to establish a cause of action for civil conspiracy. *See Juhl v. Airington,* 936 S.W.2d 640, 644 (Tex.1996). While the evidence produced by Essex may give rise to *some suspicion* that Carter and Farley agreed or intended to defraud Essex, such evidence is insufficient to raise a genuine issue of material fact on the vital fact of conspiratorial intent. *See Kindred,* 650 S.W.2d at 63 ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence."); *see also*

*$56,700 in U.S Currency v. State,* 730 S.W.2d 659,662 (Tex.1987) (when viewing meager circumstantial evidence, if "circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred"). Without a showing of a meeting of the minds or conspiratorial intent, there is no evidence of civil conspiracy and summary judgment was proper with respect to that claim. *See Odem v. Deloitte & Touche, LLP,* No. 04–09–00747–CV, 2011 WL 381721, at *9 (Tex.App.-San Antonio Feb. 2, 2011, pet. denied) (mem. op.) (affirming grant of no-evidence motion for summary judgment on civil conspiracy claim because plaintiff failed to present scintilla of evidence of conspiratorial intent); *see also Shunta v. Westergren,* No. 01–08–00715–CV, 2010 WL 2307083, at *7–8 (Tex.App.-Houston [1 Dist.]June 10, 2010, no pet.) (mem. op.) (affirming grant of no-evidence motion for summary judgment on civil conspiracy claim because appellant failed to present evidence of requisite conspiratorial intent; stating that, at most, evidence presented by appellant was some evidence that appellee agreed to conduct, but not to injury).

Although the majority apparently believes that the circumstantial evidence presented by Essex and the inferences to be drawn from such evidence amounts to more than a scintilla of evidence of conspiratorial intent, I do not. On the contrary, vital facts such as conspiratorial intent must not be established "by piling inference upon inference." *See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 858 (Tex.1968) (stating that although proof of conspiracy "may be, and usually must be made by circumstantial evidence, . . . a vital fact

dence of conspiratorial intent in their respective non-evidence motions for summary judg-

ment.

may not be established by piling inference upon inference").

For these reasons, I would affirm the trial court's final judgments as to Carter and Farley.