**Affirmed and Memorandum Opinion filed October 29, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00535-CV

---

**CASPIAN OIL SERVICES, INC. AND JAMES W. REYNOLDS, Appellants**

**V.**

**SE MANAGEMENT, LLC, Appellee**

---

**On Appeal from the 270th District Court
Harris County, Texas
Trial Court Cause No. 2010-16599**

---

## M E M O R A N D U M   O P I N I O N

In six issues, appellants Caspian Oil Services, Inc. ("COS 1") and James W. Reynolds contend the trial court erred by rendering judgment in favor of appellee SE Management, LLC ("SEM"). We affirm.

### I.  BACKGROUND

COS 1 was a corporation located in Azerbaijan, a country bordering the Caspian Sea. COS 1 leased a yard where oil and gas equipment could be stored

and provided certain services such as equipment repair. Reynolds was president and founder of COS 1. SEM was an American company involved in the oil and gas industry with offices in Houston and interested in expanding to Azerbaijan. In 2005 and early 2006, SEM personnel met with Reynolds in Houston to discuss the possibility of SEM purchasing a portion of COS 1.

On May 3, 2006, SEM and COS 1 entered into a "Letter of Intent," commemorating their understanding that SEM was interested in purchasing 75% of COS 1's shares. In the Letter of Intent, COS 1 agreed to refrain from entertaining or negotiating the sale of its shares to another party for a period of 90 days from May 3, 2006. The parties agreed SEM would conduct "a due diligence review" of COS 1's assets, financial statements, and other information. The Letter of Intent was signed by Reynolds and Mark Sadykhov, president of SEM, but neither signed in his individual capacity.

Pertinent to this litigation, the Letter of Intent included the following provisions pertaining to SEM advancing money to COS 1:

> Section 4    Advances to Seller   Upon written request from [COS 1] setting forth the specific amount of funds requested and the intended use thereof, [SEM] may, in its discretion, advance all or portions of the Purchase Price to [COS 1] in immediately available funds, as shall be agreed between the parties in writing at the time of such advance by executing documents to include a revolving secured promissory note and a securities pledge agreement[.]   Each such advance, notwithstanding the amount thereof, shall be secured by a first priority continuous lien on the Shares in favor of [SEM.]  [COS 1] shall owe interest to [SEM] over the aggregate amount of all advances made pursuant to the preceding sentences[.]   Such interest shall be calculated as LIBOR + three percent (3%) per year consisting of twelve (12) months and three hundred and sixty (360) days, and shall be payable monthly in arrears until the earlier of (I) repayment of the advances to [SEM], or (II) Closing[.]   Upon Closing, and unless otherwise agreed between the parties, all advances and all interest

thereon shall be returned to [SEM.] Subject to applicable law, if the provisions contained in the preceding sentences of this [section] are found to be unenforceable for any reason whatsoever, [SEM] shall have the option, at its discretion, to sell the Shares to any third party, at a price determined in *bona fide* arms-length negotiations between [SEM] and such third party, and retain such portion of the proceeds as are sufficient to cover [COS 1's] obligation for repayment of the principal and interest on the advances, and the remainder of such proceeds shall be disbursed to [COS 1] promptly thereafter[.]

Section 5   Repayment of Advances  All advances pursuant to Section 4, and all interest due thereon, shall be payable by [COS 1] to [SEM] or its authorized representatives and assigns upon written demand[.] If the parties do not effect Closing of the Proposed Transaction within sixty (60) calendar days from the date of the Letter, and [COS 1] fails to repay in full all advances made by [SEM] within fifteen (15) calendar days of receiving a written demand for such repayment, [SEM] shall become owner of the Shares, and shall be entitled to all rights, title and interests appurtenant to such Shares, and [COS 1] shall be obligated to take all necessary actions to institute [SEM] as the record holder of the Shares for all corporate purposes[.]

[COS 1] shall be obligated to take any actions and to execute any additional documents and instruments as may be required by [SEM] to document the either or any of the (I) security interest in the Shares in favor of [SEM], (II) the transfer of the Shares to [SEM], (III) the Closing of the Proposed Transaction (if applicable)[.]

COS 1 requested cash advances from SEM.  An SEM officer testified Reynolds represented that COS 1 had many receivables due over the next few months which would provide money to repay SEM.  The officer also testified an affiliated entity, Smith Eurasia, Ltd., advanced $110,000 to COS 1 on behalf of SEM.  Specifically, Smith Eurasia advanced $50,000 via a check signed May 10, 2006, $20,000 via a check signed July 13, 2006, and $40,000 via a check signed August 3, 2006, for a total of $110,000.  Smith Eurasia made the advances on behalf of SEM because SEM lacked sufficient funds.  It is undisputed COS 1 never gave SEM or Smith Eurasia a promissory note or any security for the advances, nor

3

did Reynolds personally guarantee the advances. SEM personnel testified Reynolds stated COS 1 needed the advances to purchase equipment and for business opportunities. Contrarily, Reynolds testified COS 1 used the advances to pay bank debts.

After Smith Eurasia made the first advance, SEM began its due-diligence review of COS 1. SEM officers testified that COS 1 was not entirely cooperative in producing documents for review and answering questions. In July and early August 2006, SEM employees visited the COS 1 facilities in Azerbaijan. Based on their review, SEM decided not to purchase COS 1's shares. On August 16, 2006, SEM's attorneys sent a letter to COS 1 demanding repayment of the $110,000 advances plus interest as agreed in the Letter of Intent. Reynolds testified that he received this demand letter.

On September 3, 2006, Reynolds sent an email to Sergey Malygin, who was CFO of both SEM and Smith Eurasia. In the email, Reynolds explained COS 1 did not have funds to repay the advances and needed additional time to find investors because SEM's decision not to invest in COS 1 hindered COS 1's ability to solicit a sale. Reynolds also stated COS 1 had already begun talking with other potential investors and, "I am not trying to not pay you but just need the time and need to protect my interest in [Azerbaijan.]"

On February 17, 2007, Reynolds sent another email to Malygin in which he proposed four options regarding the unpaid $110,000:

> (1) the parties could treat the money as a purchase of 10% of COS 1's stock until COS 1 was sold or otherwise had funds to buy back the stock;
>
> (2) the parties could renew the original proposal with some modifications;

4

(3) the parties could continue treating the money as a loan but on terms less burdensome to COS 1; or

(4) SEM could pursue legal remedies to force payment.

Reynolds warned against the fourth option, explaining he believed SEM engaged in unethical actions during the due-diligence process. Reynolds also stated he was "very diligently" trying to sell COS 1 and "[SEM's] figure is included in the purchasing agreement with whomever I discuss this with."

It is undisputed COS 1 never repaid the advances. SEM filed an initial suit against COS 1 and Reynolds on July 8, 2007. However, around this time, Reynolds set up a transfer of COS 1's assets to a new corporation, Caspian Oilfield Services, Inc. ("COS 2"). COS 2 was incorporated in the British Virgin Islands on June 18, 2007 and registered in Azerbaijan on August 17, 2007.

Reynolds testified two of his employees from COS 1, Ilkin Agayev and Babek Karimli, became the owners of COS 2. SEM presented a July 1, 2007 agreement between COS 1 and COS 2 which provided for the transfer of COS 1's equipment to COS 2. According to Reynolds, he actually signed this agreement later and someone back-dated it to July 1, 2007. SEM also presented an August 30, 2007 agreement in which COS 1 sold its assets to COS 2 for approximately 121,000 manta (Azerbaijan currency).

Reynolds testified that, despite these agreements, COS 1 did not actually receive any consideration from COS 2 for COS 1's assets. Reynolds testified he simply "gave" the assets to COS 2 because COS 1 did not own any equipment but was leasing equipment from another company. Reynolds also testified he transferred the assets for no value because was tired of living in Azerbaijan and wanted to return to the United States. Nevertheless, COS 1 and COS 2 signed tax documents reflecting the asset sale. Additionally, when COS 1 was still active, it

5

applied for a valuable certification needed to perform certain equipment work. It takes several years for the governing body to grant this certification. Eventually, this certification was granted to COS 2.

On June 29, 2007, Reynolds sent SEM a letter in which he reiterated COS 1's inability to repay the advances. He also expressed that COS 1 "acknowledges the debt which you mentioned in you lawsuit" and made the following offer, "[I]f you care to prepare a formal judgment for the amount which is owed, [COS 1] stands ready[,] willing, and able to sign such confession of Judgment for the appropriate amount." SEM did not agree to this offer.

In September and October 2007, Reynolds—despite not being an owner of COS 2—discussed selling COS 2 with Independent Oil Tools-DOSCO B.V. ("IOT").[1] In 2008, IOT purchased a majority of COS 2's shares. Reynolds began working for IOT as a vice-president of international business development, although Reynolds testified he was always an independent contractor of IOT.

After SEM nonsuited its original suit, it refiled suit against Reynolds, COS 1, and COS 2.[2] Following a bench trial, the trial court found the following:

- COS 1 is liable for breach of the Letter of Intent contract;
- COS 1, COS 2,[3] and Reynolds conspired to fraudulently transfer the assets of COS 1 to COS 2; and

---

[1] Reynolds testified he had been discussing a potential sale of COS 1 with IOT for around two years. When Reynolds resumed talks with IOT in the fall of 2007, he explained, "I have passed [COS 1] in [Azerbaijan] to my previous employees."

[2] SEM also sued IOT. After SEM presented its case, the trial court granted IOT's motion for a take-nothing judgment on SEM's claims. SEM does not appeal this ruling.

[3] COS 2 appeared in the litigation but did not attend trial. The trial court granted SEM's motion for post-answer default judgment against COS 2. COS 2 is not a party to this appeal.

- These three defendants are jointly and severally liable for fraudulent transfer.[4]

The trial court rendered judgment that SEM recover from COS 1, COS 2, and Reynolds $110,000 in "liquidated damages" plus $54,804.70 in prejudgment interest, and recover from COS 1 $70,000 in attorney's fees.

## II. STANDING

In their first issue, appellants contend SEM lacked standing to bring claims because Smith Eurasia, not SEM, advanced the $110,000 to COS 1. Standing is a prerequisite to subject matter jurisdiction. *Bland I.S.D. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000). Standing focuses on whether a party has a sufficient relationship with a lawsuit to have a "justiciable interest" in its outcome. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). A plaintiff has standing when it is personally aggrieved. *Id.* The standing doctrine requires that there be a real controversy between the parties that actually will be determined by the judicial declaration sought. *Id.* at 849. Standing is a question of law subject to de novo review. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012).

Appellants refer to a check-history ledger for Smith Eurasia, showing Smith Eurasia made the three payments to COS 1. Appellants also rely on the following testimony of Glenda Jackson, office manager and bookkeeper for SEM:

(1) SEM and Smith Eurasia are affiliated but separate companies;

(2) Smith Eurasia made the advances on behalf of SEM because SEM lacked sufficient funds to make the advances;

(3) COS 1 did not give a promissory note or security for the advances, despite the Letter of Intent requiring COS 1 to provide such items if an advance was made;

---

[4] The trial court also found that these defendants were liable for "breach of constructive trust." We need not address this finding to adjudicate this appeal.

7

(4) SEM never repaid Smith Eurasia; and

(5) Jackson is not aware of whether there are documents reflecting that Smith Eurasia had attempted to collect the debt from SEM.

Appellants argue the foregoing evidence conclusively establishes that Smith Eurasia made the advances and never requested repayment from SEM. Appellants contend no evidence connects the funds provided by Smith Eurasia to SEM or supports a finding that COS 1 is liable to SEM for the funds. According to appellants, SEM suffered no damages when COS 1 failed to repay the funds and therefore lacks standing. In support of their argument, appellants cite cases in which courts determined plaintiffs lacked standing to bring claims based on injuries suffered by separate parties. *See R2 Enters., Inc. v. Whipple*, No. 02-07-00257, 2008 WL 2553444, at *3–4 (Tex. App.—Fort Worth June 26, 2008, pet. denied) (mem. op.) (holding general and limited partner did not have standing because direct injury was to partnership which actually contracted with land seller and was to profit from the contract); *Boy Scouts of Am. v. Responsive Terminal Sys., Inc.*, 790 S.W.2d 738, 746–47 (Tex. App.—Dallas 1990, writ denied) (holding national group lacked standing to bring breach-of-contract claim against company on behalf of affiliated local groups because the local groups and company were the only parties in privity of contract).

Although SEM is separate from Smith Eurasia, they are affiliated entities, and Jackson testified that Smith Eurasia made the advances *on* SEM's behalf. Consistent with this arrangement, Jackson testified SEM's accounting records showed the advances as cash out from Smith Eurasia, and they also reflected a $110,000 receivable owed by SEM to Smith Eurasia. Accordingly, Smith Eurasia, an affiliate of SEM, loaned SEM the money for the $110,000 and advanced this

8

amount to COS 1 on SEM's behalf. Thus, the evidence shows that the advance was made under the Letter of Intent by SEM to COS 1 by means of Smith Eurasia.[5]

Consequently, SEM made the advances under the Letter of Intent and had standing to seek repayment from COS 1. We reject appellants' contention that the parties' failure to comply with the promissory note and security provisions of the Letter of Intent meant the advances were not made pursuant to the Letter of Intent. SEM's failure to require COS 1 to provide security for the advances may have made it more difficult for SEM to recover its debt but did not nullify the Letter of Intent.

The fact that SEM would seek repayment of the funds even though SEM advanced the funds by means of its affiliate Smith Eurasia was not lost on COS 1. COS 1 understood Smith Eurasia was not gifting COS 1 $110,000—the money was an advance made pursuant to the Letter of Intent between SEM and COS 1. In response to SEM's demand for repayment of the advances, Reynolds acknowledged the debt was incurred pursuant to the Letter of Intent (to which only SEM and COS 1 were parties). Moreover, after SEM filed suit, Reynolds sent a letter to SEM (not Smith Eurasia) in which he stated that COS 1 acknowledges the debt "mentioned in your lawsuit" and would sign a "confession of Judgment for the appropriate amount." Accordingly, the parties understood that SEM was not a stranger to the advances but was the party who made the advances and who had a right to demand repayment. We overrule appellants' first issue.

---

[5] We acknowledge the Letter of Intent contained a provision that SEM "shall become the owner" of 75% of COS 1's shares if COS 1 fails to repay advances within 15 days after written demand. At trial, the parties did not argue SEM received these shares. In fact, as noted above, Reynolds suggested in an email that SEM become holder of *10%* (as opposed to 75%) of COS 1's shares. On appeal, none of the parties contend SEM owns any of COS 1's shares.

### III. APPELLANTS' COMPLAINTS ON THE MERITS

In their second through fifth issues, appellants argue the evidence is legally and factually insufficient to support certain of the trial court's implicit findings pertaining to damages, constructive trust, fraudulent transfer, and civil conspiracy.

## A. Standard of Review

When the appellate record includes the reporter's record, the trial court's findings may be challenged for legal and factual sufficiency of the evidence by the same standards applied in reviewing the evidence supporting a jury's finding. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When a party challenges legal sufficiency of the evidence relative to an adverse finding on which he did not bear the burden of proof, we apply the "no evidence" standard and may sustain the challenge only when the record shows (a) a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). When considering a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *Id.* We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict under review. *Id.* The fact finder is the sole judge of witness credibility and the weight to give their testimony. *Id.* at 819.

A party challenging factual sufficiency of the evidence relative to an adverse finding on which he did not bear the burden of proof must demonstrate the

evidence supporting the finding is so weak or so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). When considering a factual-sufficiency challenge, we consider and weigh all the evidence, both supporting and contradicting the finding. *See Ellis*, 971 S.W.2d at 406–07. We may not substitute our own judgment for that of the trier of fact or pass upon the credibility of the witnesses. *See id.* at 407. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *GTE Mobilnet of S. Tex. L.P. v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

## B. Analysis

### 1. Damages

In their second issue, appellants contend the evidence is legally and factually insufficient to support the trial court's implicit finding that SEM incurred damages as a result of its dealings with appellants because SEM did not advance the money and, thus, suffered no damages when COS 1 failed to repay the advances. We already have determined SEM has standing to seek repayment of the funds based upon evidence that SEM advanced the money to COS 1 by means of its affiliate Smith Eurasia. Under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support a finding that SEM sustained damages when COS 1 failed to repay the advances. Accordingly, we overrule appellants' second issue.

11

## 2. Uniform Fraudulent Transfer Act

In their fourth issue, appellants assert various arguments in support of the contention that the evidence is legally and factually insufficient to support the trial court's implicit findings relevant to SEM's claim under the Uniform Fraudulent Transfer Act ("UFTA").

The UFTA is intended to prevent a debtor from defrauding its creditors by moving assets out of reach. *Citizens Nat. Bank of Tex. v. NXS Const., Inc.*, 387 S.W.3d 74, 79–80 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Bus. & Com. Code Ann. §§ 24.001–.013 (West 2009) (UFTA). Numerous types of transactions are fraudulent for purposes of UFTA. *See* Tex. Bus. & Com. Code Ann. §§ 24.005, .006. "'Creditor' means a person . . . who has a claim." *Id.* § 24.002(4). "'Claim' means a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3).

SEM pleaded, and the trial court impliedly found, that the transfer of assets from COS 1 to COS 2 constituted a fraudulent transfer under subsections (a)(1) and (a)(2) of section 24.005 of UFTA. *See id.* § 24.005 (West 2009) (stating that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction").

Under their fourth issue, appellants argue there is no evidence SEM sustained damages because Smith Eurasia made the advances. For the reasons stated above, we reject this argument.

Appellants also argue the evidence is legally and factually insufficient to support recovery under SEM's UFTA claim because COS 1 was expressly permitted under the Letter of Intent to negotiate its sale with other parties 90 days after March 3, 2006. COS 1's assets were sold to COS 2 in 2007, more than 90 days after March 3, 2006. Furthermore, appellants contend that, in Reynolds's September 2006 and February 2007 correspondences with SEM regarding the demand for repayment, he advised that COS 1 was actively looking for new investors, thus allegedly showing that SEM was aware appellants were trying to sell COS 1.

However, evidence supporting the foregoing propositions would not preclude findings in SEM's favor regarding the UFTA claim. Even if this transfer is not prohibited by the Letter of Intent and even if SEM knew COS 1 was looking for new investors and that the sale had occurred, the transfer could still constitute a fraudulent transfer under section 24.005. *See id.* § 24.005. Additionally, when Reynolds informed SEM that he was actively attempting to sell COS 1, he stated he was taking SEM's $110,000 advances into account when negotiating a purchase price. Nevertheless, Reynolds testified he ultimately transferred COS 1 to two of his employees for no consideration, despite the fact that an August 30, 2007 agreement between COS 1 and COS 2 provided that COS 2 was paying approximately 121,000 manta (Azerbaijan currency) for COS 1's assets. Two SEM officers testified Reynolds never informed them he was transferring COS 1's assets to COS 2. Moreover, shares of COS 2 stock were later sold to IOT for

13

approximately $100,000. Having concluded that all of appellants' arguments under their fourth issue lack merit, we overrule that issue.[6]

### 3. Conspiracy

Under their fifth issue, appellants assert various arguments in support of the contention that the evidence is legally and factually insufficient to support the trial court's conspiracy finding.

Appellants first argue there is no evidence SEM sustained damages because Smith Eurasia made the advances. For the reasons stated above, we reject this argument.

Appellants also challenge the sufficiency of the evidence as to the remaining elements of conspiracy. As applied in the context of SEM's conspiracy allegations, these remaining elements are that Reynolds, COS 1, and COS 2 had a meeting of the minds on the object of fraudulently transferring the assets from COS 1 to COS 2 and that Reynolds engaged in one or more overt acts to this end.[7] *See PAS, Inc. v. Engel*, 350 S.W.3d 602, 616 (Tex. App.—Houston [14th Dist.] 2011, no pet.).[8]

---

[6] In a portion of the "Summary of the Argument" section of their brief regarding SEM's fraudulent-transfer claim, appellants state, "No funds were advanced to [Reynolds] by anyone." Presumably, appellants are arguing Reynolds could not have been trying to evade a creditor because no one advanced funds to Reynolds in his individual capacity. However, we need not address this issue because, as determined in the following section, appellants have not established that the evidence is insufficient to support the trial court's conspiracy finding involving COS 1, COS 2, and Reynolds in his individual capacity.

[7] Because the judgment against COS 1 may be affirmed based upon claims previously addressed in this opinion, we address the evidence of conspiracy only as to Reynolds.

[8] Appellants contend there is no evidence Reynolds, individually, removed funds from COS 1. However, such evidence is not necessary for there to be legally and factually sufficient evidence of the foregoing elements. To support the conspiracy findings against Reynolds, there need not be evidence that Reynolds personally absconded with COS 1's assets or the advanced funds. Reynolds can be held liable for fraudulent transfer as a conspirator as long as there is evidence showing he participated in a conspiracy to fraudulently transfer COS 1's assets to COS

Reynolds forwarded to Karimli his February 17, 2007 email in which he suggested to SEM four resolutions of the repayment issue. Karimli later became one of the owners of COS 2, to which COS 1's assets were transferred. COS 2 benefited by receiving COS 1's assets without having to pay consideration. Moreover, Reynolds attempted to benefit individually from the transfer by gaining an ownership interest in COS 2. Reynolds testified that, during the negotiations with IOT for the purchase of COS 2, he wanted to receive an ownership interest in COS 2 "[b]ecause it was [his] company." In fact, Karimli and Agayev offered Reynolds 5% of COS 2's shares, but Reynolds ultimately declined because IOT did not want outside investors.

We hold the foregoing evidence and inferences arising therefrom are legally and factually sufficient to support the challenged elements of SEM's conspiracy claim. First, at least two persons were involved—Reynolds and COS 2 through Karimli's acts. Second, Reynolds and COS 2 had a meeting of the minds to accomplish the transfer of COS 1's assets to defraud SEM because Reynolds relayed to Karimli information regarding SEM's valid request for repayment but Reynolds and Karimli nevertheless ignored the request and worked together to transfer COS 1's assets to COS 2. Finally, Reynolds committed an unlawful, overt act in furtherance of the conspiracy by transferring COS 1's assets to COS 2. *See Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 378 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (holding there was fact issue on whether defendants conspired to commit fraudulent transfer). We overrule appellants' fifth issue.[9]

---

2. *See Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 378 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

[9] In their third issue, appellant assert the evidence is legally and factually insufficient to support the trial court's finding that they were liable for "breach of constructive trust." Because the trial court's judgment may be affirmed based upon the UFTA claim and conspiracy, we need not and do not address issue three.

## IV. ATTORNEY'S FEES

Finally, in their sixth issue, appellants contend SEM may not recover attorney's fees from COS 1 pursuant to section 38.001(8) of the Civil Practice and Remedies Code because SEM did not suffer any damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2008) (providing party may recover attorney's fees, in addition to amount of valid claim, if claim is based on contract); *Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 40–41 (Tex. 2012) ([T]o qualify for fees under [section 38.001(8)], a litigant must prevail on a breach of contract claim and recover damages."). However, we have affirmed the trial court's breach-of-contract damages awarded against COS 1. Accordingly, we overrule appellants' sixth issue.

We affirm the trial court's judgment.

/s/    John Donovan
      Justice

Panel consists of Chief Justice Frost and Justices Boyce and Donovan.