**Opinion issued June 21, 2018**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-17-00084-CV**

———————————

**LEONEL FERRARA, Appellant**

**V.**

**JOAN NUTT AND MAICK S. DALU, Appellees**

**On Appeal from the 334th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-48461**

# O P I N I O N

This real property dispute arises out of an attempt to purchase a piece of

property through a contract for deed. Appellant, Leonel Ferrara, sued appellees,

Joan Nutt and Maick S. Dalu, for several causes of action including breach of

contract, fraud, violations of the Deceptive Trade Practices Act, violations of the Texas Property Code, and a suit to quiet title after Nutt sold the property at issue to Dalu despite having previously executed a contract for deed with Ferrara. Nutt did not answer or appear, and, after a bench trial, the trial court rendered a default judgment against Nutt on Ferrara's breach of contract claim and awarded damages. The trial court dismissed all other claims against Nutt as well as all claims against Dalu.

In three issues, Ferrara argues on appeal that (1) the trial court erroneously concluded that he was not entitled to the protective provisions of the Texas Property Code concerning certain executory contracts involving residential property; (2) the dismissal of his suit to quiet title "produces a manifestly unjust result" and "condones the very conduct that [the relevant sections of the Property Code] intends to prevent"; and (3) Dalu is required to convey the property to Ferrara under the terms of the contract for deed, which bind the parties' successors and assigns.

We affirm.

## Background

In May 2011, Ferrara and Nutt entered into a "Contract for the Lease and Mandatory Purchase of Real Estate" ("the Contract") concerning a residential property in north Houston. The parties agreed that Ferrara would lease the property from Nutt beginning in August 2011 and that the lease term would terminate on

2

August 1, 2024.  The Contract provided that Ferrara would pay $847.17 per month in rent to Nutt, and Nutt agreed to pay the assessed property taxes during the lease term.

The "mandatory purchase" portion of the Contract provided that Nutt would sell the property to Ferrara on or before August 30, 2024.  The Contract required Ferrara to pay $3,000 in earnest money and provided that the purchase price for the property was $55,000.  The Contract allowed Ferrara to deduct the earnest money deposit and all rents that he paid during the lease term from the purchase price.  The Contract also required Ferrara to execute a promissory note at closing for the balance of the purchase price at an interest rate of 4.5% per year.  The Contract included a provision stating that "[a]ll covenants, conditions and agreements and undertakings" stated in the Contract "shall extend to and be binding on the respective heirs, successors and assigns of the respective parties hereto the same as if they were in every case named and expressed."  The second-to-last page of the Contract included a handwritten notation above Nutt's signature stating, "After 12 years or 55,000.000[,] fifty five thousand paid, the lessor [sic] shall own the property."  Nutt did not record the Contract in the Harris County real property records.

The property required extensive repairs to be habitable, and Ferrara spent approximately $13,700 on these repairs beginning in August 2011.  Ferrara's expenditures included installing a new air conditioning unit, fixing drywall in the

3

garage and the living room, making repairs to the kitchen and bathrooms, installing new carpet, painting the interior and exterior, landscaping, and removing beehives on the exterior.

In November 2011, Nutt modified the terms of the Contract in an e-mail to Ferrara. Nutt lowered Ferrara's monthly payments to $540.72, but extended the lease term to fifteen years, or until October 1, 2026, and raised the annual interest rate to 9.1%. Nutt stated in the e-mail, "If 2 months of payments are missed after November 1, 2011, I will have to consider our contract of lease to own void."

Due to the unexpected expenditures to make the property habitable, Ferrara decided to rent the property to Leticia Rodriguez beginning in 2012 to recoup the money that he had spent repairing the house. Rodriguez paid Ferrara $850 per month in rent. Ferrara continued making his monthly payments, now at the lower rate of $540.72 per month, to Nutt.

In June 2013, Nutt sold the property to Dalu for approximately $40,000. Rodriguez continued living at the property after this sale, and, beginning in July 2013, she made her monthly rental payments to Dalu instead of Ferrara.

In August 2013, Ferrara sued Nutt and Dalu. Ferrara brought a suit to quiet title, asserting that the deed conveying the property from Nutt to Dalu was invalid because Nutt "had no title or interest in the [p]roperty at the time of the conveyance, and had no authority, actual or apparent, to convey [Ferrara's] property." Ferrara

4

alleged that Nutt violated the Deceptive Trade Practices Act ("DTPA") by "advertis[ing] goods or services with intent not to sell them as advertised" and "represent[ing] that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." Ferrara also alleged that Nutt engaged in false, misleading, or deceptive acts by violating eleven provisions of the Texas Property Code relating to executory contracts for residential property, which are considered "tie in" statutes under the DTPA. Further, Ferrara asserted causes of action for fraud in a real estate transaction, breach of fiduciary duty, money had and received, and breach of contract against Nutt, and causes of action for common law fraud and tortious interference with contract against Nutt and Dalu. Ferrara sought actual damages, treble damages under the DTPA, and exemplary damages.

Nutt did not file an answer and did not appear at trial. Dalu answered and appeared at trial, representing himself pro se. At a bench trial, Ferrara testified that he purchased the property from Nutt because he was going to live there with his family. He stated that, at the time he entered into the Contract with Nutt, Nutt told him that Dalu had wanted to buy the house, but Nutt preferred to sell it to Ferrara because he and his children lived in a mobile home and needed a larger space, whereas Dalu did not need the house. Ferrara testified that he lived in a mobile home next to his business and that he rented the house to Rodriguez because he had spent

5

a significant amount of money fixing up the house and he "wanted to recover the money that [he] had invested in the house."

Ferrara testified that Dalu knew that Ferrara had purchased the property from Nutt prior to the June 2013 deed between Nutt and Dalu.[1] Ferrara testified that he had known Dalu for over fifteen years and that he went into one of Dalu's convenience stores on a near-daily basis. On one occasion, Dalu asked Ferrara if he had purchased the house from Nutt, and Ferrara explained the lease-to-own agreement he had made with Nutt. Dalu then suggested that he loan Ferrara $25,000 to purchase the house, the house could belong to both of them, and they could rent out the house. Ferrara declined this offer, testifying that he told Dalu that Nutt wanted Ferrara to purchase the property for his children, whom Nutt had known for years.

Rodriguez testified that she began living at the property in 2012. She stated that she first spoke with Dalu around April or May of 2013 when Dalu stopped by the house and asked if she was renting or buying the house. Rodriguez told Dalu that she rented the house and that "the owner lives a couple [of] streets down. His name is Leonel [Ferrara]. He's the owner of the house, not me."

---

[1] Ferrara's daughter, Sarah Ferrara, also testified that Dalu knew that Ferrara had purchased the house. She stated that, on several occasions, she stopped by Dalu's store with her brother, and Dalu told her to tell Ferrara that "Ms. Nutt was trying to get a hold of [Ferrara] for something about the mortgage of the house."

Dalu testified that, before he purchased the house from Nutt, he stopped by the house and asked Rodriguez if she was renting the house and how much her rental payments were each month. Rodriguez told him that she paid $850 per month, and Dalu testified that Nutt had told him that Ferrara paid her around $500 per month, so his understanding was that Ferrara leased the property from Nutt and then made around $200 or $300 as a commission by leasing the property to Rodriguez. He testified that he was never told that Ferrara had an ownership interest in the property. Dalu denied knowing specific information about the contractual relationship between Nutt and Ferrara.

The trial court entered a take-nothing judgment on Ferrara's claims against Dalu and dismissed those claims with prejudice. The trial court also granted a default judgment against Nutt and awarded Ferrara judgment on his breach of contract claim against Nutt in the amount of $13,772.78, plus costs and pre- and post-judgment interest.

The trial court also entered findings of fact and conclusions of law. Relevant to this appeal, the trial court found that "[n]either Ferrara nor his family members lived at the Property" and that "Ferrara rented the Property to Ms. Leticia Rodriguez, who lived there continuously from early 2012 through all times relevant to this suit." The trial court also found that Ferrara presented no evidence "that he paid the earnest

7

money [deposit] required by the Contract." The trial court entered the following conclusions of law, among others:

3. The evidence presented does not support recovery on any other causes of action pled against Nutt, and all of Plaintiff's claims against Nutt other than breach of contract should be dismissed.

4. The protective provisions of Texas Property Code Section 5, Subchapter D, which relate generally to executory contracts for the conveyance of residential real property, do not apply to the Contract because the Property was not "used or to be used as the purchaser's residence or as the residence of a person related to the purchaser within the second degree by consanguinity or affinity." *See* TEX. PROP. CODE § 5.062(a). There was no or insufficient evidence that the Property was being used as Ferrara's residence or that Ms. Leticia Rodriguez is related to him.

5. There was no or insufficient evidence presented to support Plaintiff's claims against Dalu for breach of contract, fraud, DTPA (if and to the extent pled against him), breach of fiduciary duty, tortious interference with contract, money had and received or for exemplary damages, and all such claims against Dalu should be dismissed.

6. Because the Contract does not comply with Section 5, Subchapter D of the Texas Property Code, Plaintiff's suit to quiet title should be denied.

This appeal followed.

**Applicability of Provisions Relating to Residential Executory Contracts**

In his first issue, Ferrara contends that the trial court erroneously concluded that Property Code Chapter 5, Subchapter D, which applies to certain residential executory contracts, does not apply to the Contract with Nutt. Specifically, he contends that the trial court erred by concluding that the property was not "to be

used" as Ferrara's residence, which would bring the Contract within the ambit of the protections of Subchapter D.

## A.   *Standard of Review*

In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal and factual sufficiency of the evidence supporting the fact findings by using the same standards to review jury verdicts. *Nguyen v. Yovan*, 317 S.W.3d 261, 269–70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994), and *In re K.R.P.*, 80 S.W.3d 669, 673 (Tex. App.— Houston [1st Dist.] 2002, pet. denied)).   A trial court's fact findings are not conclusive when, as here, a complete reporter's record exists. *Id.* at 270.

When a party challenges the legal sufficiency of an adverse finding on which he had the burden of proof at trial, he must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Id.* (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001)).   In conducting this review, we examine the record for evidence that supports the trial court's finding "while ignoring all evidence to the contrary." *Id.* (quoting *Francis*, 46 S.W.3d at 241).   If no evidence supports the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* "We will

9

sustain the legal sufficiency challenge 'only if the contrary proposition is conclusively established.'" *Id.* (quoting *Francis*, 46 S.W.3d at 241).

When a party challenges the factual sufficiency of an adverse finding on which he had the burden of proof at trial, the party must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Id.* (quoting *Francis*, 46 S.W.3d at 242). We consider and weigh all of the evidence, and we set aside the verdict only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Id.* (quoting *Francis*, 46 S.W.3d at 242).

We review the trial court's conclusions of law de novo. *Id.* at 267. We will uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence. *Id.* Incorrect conclusions of law do not require reversal if the controlling fact findings support the judgment under a correct legal theory. *Id.*

## B. *Residential Executory Contracts*

An executory contract, or a "contract for deed," is a real-estate transaction that allows the seller of the property to retain title until the purchaser has paid for the property in full. *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 429 (Tex. 2005); *Bryant v. Cady*, 445 S.W.3d 815, 819 (Tex. App.—Texarkana 2014, no pet.) ("An executory contract for real property typically results in the buyer being entitled to immediate possession of the property on the making of a down payment."). "A

10

contract for deed differs from a conventional contract for the sale of realty, in which the seller and purchaser mutually agree to complete payment and title transfer on a date certain at which time the purchaser generally obtains both title and possession." *Bryant*, 445 S.W.3d at 819; *Graves v. Diehl*, 958 S.W.2d 468, 471 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (noting that under contract for deed, title remains with seller until purchase price is paid in full, which typically occurs in installments over course of years). A contract for deed "serves to provide persons unable to obtain conventional mortgage financing an alternative means of purchasing real property." *Shook v. Walden*, 368 S.W.3d 604, 625 (Tex. App.—Austin 2012, pet. denied).

Texas Property Code Chapter 5, Subchapter D governs certain executory contracts for the conveyance of real property. *See* TEX. PROP. CODE ANN. §§ 5.061–.086 (West 2014 & Supp. 2017); *Smith v. Davis*, 462 S.W.3d 604, 609 (Tex. App.—Tyler 2015, pet. denied) (stating that executory contracts for residential properties are "highly regulated by the legislature"). Subchapter D imposes several procedural requirements, including notice and disclosure requirements, remedies upon default, and the purchaser's right to cancel the contract. *See, e.g.*, TEX. PROP. CODE ANN. §§ 5.063, .064, .069, .071, .074 (West 2014 & Supp. 2017); *Morton v. Nguyen*, 412 S.W.3d 506, 510 (Tex. 2013). Section 5.076 requires a seller to record the executory contract, along with a required disclosure statement, in the real property records on

11

or before the thirtieth day after the date the contract is executed. TEX. PROP. CODE ANN. § 5.076(a) (West Supp. 2017).

Property Code section 5.062(a) governs applicability of Subchapter D and provides that

> [Subchapter D] applies only to a transaction involving an executory contract for conveyance of real property used or to be used as the purchaser's residence or as the residence of a person related to the purchaser within the second degree by consanguinity or affinity, as determined under Chapter 573, Government Code. For purposes of this subchapter, and only for the purposes of this subchapter:
>
> (1)  a lot measuring one acre or less is presumed to be residential property; and
>
> (2)  an option to purchase real property that includes or is combined or executed concurrently with a residential lease agreement, together with the lease, is considered an executory contract for conveyance of real property.

*Id.* § 5.062(a) (West Supp. 2017).

The Texas Supreme Court has held that, generally, for individuals, "'residence' means the '[p]lace where one actually lives or has his home; a person's dwelling place or place of habitation; . . . a dwelling house'" and that permanent residence "requires a home and fixed place of habitation to which a person intends to return when away." *Owens Corning v. Carter*, 997 S.W.2d 560, 571 (Tex. 1999) (construing "residence" as used in forum non conveniens statute); *Dickey v. McComb Dev. Co.*, 115 S.W.3d 42, 45 (Tex. App.—San Antonio 2003, no pet.) (construing "residence" as used in Subchapter D). "An individual does not,

12

however, have to be physically present within the home in order to claim it as his residence. He may live temporarily in one place while maintaining his residence in another." *Dickey*, 115 S.W.3d at 45; *Malnar v. Mechell*, 91 S.W.3d 924, 928 (Tex. App.—Amarillo 2002, no pet.). Furthermore, "the fact that an individual leases the abode while physically absent from it does not mean, by itself, that the abode is no longer his residence." *Dickey*, 115 S.W.3d at 45; *Malnar*, 91 S.W.3d at 929.

The San Antonio Court of Appeals first addressed whether evidence was sufficient to uphold a trial court's finding that the property was not "used or to be used as a residence" by purchasers under a contract for deed in *Dickey*. *See* 115 S.W.3d at 45. In that case, the purchasers lived on the property and made improvements to the property for approximately six years. *Id.* The purchasers then moved off of the property due to a change in the land restrictions, and they first attempted to sell the property before leasing the property to a third party. *Id.* The purchasers did not receive mail at the property and the taxing authority had removed their homestead designation on the property. *Id.* One of the purchasers testified that they intended to move back to the property no sooner than five years from the date of trial, when their daughter finished high school, but the purchaser also testified that she could not commit to that date because she "can't predict the future." *Id.* The purchaser "did not produce any evidence of definite plans or preparations to return to the property in question." *Id.*

After a bench trial, the trial court in *Dickey* determined that Subchapter D did not apply because the property was not used or to be used as the purchaser's residence, and the court rendered a take-nothing judgment in favor of the seller. *Id.* at 44. On appeal, the San Antonio Court concluded that, viewing the evidence in the light most favorable to the seller, "a trier of fact could reasonably infer from the record that the property was not going to be used as a residence by the [purchasers]." *Id.* at 45–46. The court thus held that legally and factually sufficient evidence supported the trial court's finding that Subchapter D and its protective provisions did not apply to the purchasers' contract for deed with the seller. *Id.* at 46.

The San Antonio Court returned to this question two years after *Dickey* in *Marker v. Garcia*, this time addressing the issue in the context of a summary judgment proceeding. *See* 185 S.W.3d 21 (Tex. App.—San Antonio 2005, no pet.). In *Marker*, the purchasers under a contract for deed provided an affidavit as summary judgment evidence which stated "their intent to use the property as their residence within three years." *Id.* at 25. The trial court granted summary judgment in favor of the seller, and the purchasers appealed, arguing, among other things, that they had raised a fact issue concerning the applicability of Subchapter D and whether they intended for the property to be used as their residence. *Id.* at 24–25.

The court noted that "'used or to be used' is broad language" and that the express terms of section 5.062(a) "encompasses real property which is presently

being used as the purchaser's residence as well as real property which will be so used in the future." *Id.* at 25 (quoting *Sanchez v. Brandt*, 567 S.W.2d 254, 258 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.)). The court looked to the legislative history of Subchapter D, noting that the subchapter had been enacted to provide protections for low-income individuals purchasing property under contracts for deed in the colonias along Texas' southern border. *Id.* at 26. The court ultimately stated:

> [W]e acknowledge that the [purchasers'] simple statements of intent may be too weak to convince a jury that they intended to use the property as a residence even under the forward-looking 'to be used' standard adopted by the Legislature. In the summary judgment context, however, we are required to consider the evidence in the light most favorable to the non-movant. Accordingly, constrained by the applicable standard of review, we must conclude that a genuine issue of material fact has been raised about whether the property was 'to be used' as the [purchasers'] residence.

*Id.* at 27–28 (internal citations omitted). Because the purchasers raised at least a fact issue concerning whether they intended for the property to be used as their residence, the San Antonio Court remanded the purchasers' claim relating to the seller's alleged violation of the provisions of Subchapter D. *Id.* at 30; *but see Garces v. Hernandez*, No. 13-13-00242-CV, 2016 WL 2970686, at *4 (Tex. App.—Corpus Christi May 19, 2016, no pet.) (mem. op.) (affirming summary judgment against purchaser when sole evidence supporting argument that purchaser used property as her residence was her "own interested-party affidavit" stating that she "used the property as her

15

residence after purchasing it, without otherwise specifying when [she] resided there" and seller controverted with her affidavit stating that purchaser "was renting the house to other people").

## C. *Evidence That Property Was Used or to be Used as Ferrara's Residence*

In its findings of fact, the trial court found that "[n]either Ferrara nor his family members lived at the Property" and that "Ferrara rented the Property to Ms. Leticia Rodriguez, who lived there continuously from early 2012 through all times relevant to this suit." The trial court concluded that Subchapter D did not apply to the Contract because the property was not "used or to be used at the purchaser's residence," as there was insufficient evidence that "the Property was being used as Ferrara's residence or that Ms. Leticia Rodriguez is related to him." On appeal, Ferrara contends that the record supports the conclusion that he never abandoned his intent to use the property as the residence for himself and his family and that the trial court's finding to the contrary is against the great weight and preponderance of the evidence.

It is undisputed that Ferrara was not living on the property at the time Nutt sold the property to Dalu in June 2013; instead, Ferrara had rented the property to Rodriguez beginning in early 2012, and he and his family lived on another property nearby. As evidence that Ferrara intended for the property to be used as his residence, he points to his testimony that he entered into the Contract with Nutt

16

"[b]ecause [he] was going to move to live in [the property]." He testified that he turned down Dalu's offer to purchase the property jointly "because Ms. Nutt wanted [Ferrara] to purchase the house for [his] children, because she has known them for a long time." He also testified that, prior to entering into the Contract, Nutt told him that Dalu wanted to buy the property but she preferred for Ferrara to purchase the property "for [his] children, because [they] live in a mobile home, and [they] don't fit inside [their] house." He further testified that he rented the property to Rodriguez because he had spent over $13,000 in repairs to the property to make it habitable, which he had not expected to expend, and he wanted to recoup his investment in the property.

Ferrara argues that the fact that he rented the property to Rodriguez does not mean that he abandoned his intent to make the property his permanent residence. However, the record contains no evidence concerning Ferrara's plans to move back onto the property. He offered no timeframe of how long he had intended to rent the property to Rodriguez or of when he planned to move onto the property beyond his testimony that he rented the property to recover what he had invested in repairs to the property. He presented no evidence of definite plans or preparations to return to the property. Viewing the evidence in the light most favorable to the trial court's findings, as we must, we conclude that the trial court reasonably could have inferred from the evidence presented that the property was not going to be used as a residence

17

by Ferrara and that this finding was therefore not against the great weight and preponderance of the evidence. *See Dickey*, 115 S.W.3d at 45–46 (holding that legally and factually sufficient evidence supported trial court's finding that purchasers did not intend for property to be used as their residence despite testimony that purchasers intended to move back onto property no sooner than five years from trial when purchasers could not commit to returning to property and did not present evidence of definite plans or preparations to return to property); *see also Marker*, 185 S.W.3d at 27 (noting that while purchasers' simple statement of intent to use property as residence within three years was enough to raise fact issue in summary judgment proceeding, it "may be too weak to convince a jury that [the purchasers] intended to use the property as a residence").

We overrule Ferrara's first issue.

## Suit to Quiet Title

In his second issue, Ferrara contends that the trial court's denial of his suit to quiet title "produces a manifestly unjust result" and "condones the very conduct that Subchapter D intends to prevent." Ferrara argues that the trial court improperly concluded that because Subchapter D and its protections do not apply to the Contract, his suit to quiet title must be denied. We disagree.

A suit to quiet title relies on the invalidity of the defendant's claim to the property and "exists 'to enable the holder of the feeblest equity to remove from his

way to legal title any unlawful hindrance having the appearance of better right.'" *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 388 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (quoting *Bell v. Ott*, 606 S.W.2d 942, 952 (Tex. Civ. App.—Waco 1980, writ ref'd n.r.e.)); *Montenegro v. Ocwen Loan Servicing, LLC*, 419 S.W.3d 561, 572 (Tex. App.—Amarillo 2013, pet. denied) (stating that elements of suit to quiet title are (1) plaintiff has interest in specific property, (2) title to property is affected by defendant's claim, and (3) defendant's claim, although facially valid, is invalid or unenforceable). "A cloud on title exists when an outstanding claim or encumbrance is shown, which on its face, if valid, would affect or impair the title of the owner of the property." *Hahn v. Love*, 321 S.W.3d 517, 531 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The effect of a suit to quiet title is "to declare invalid or ineffective the defendant's claim to title." *Essex Crane*, 371 S.W.3d at 388. The plaintiff bears the burden of supplying the proof necessary to establish his superior equity and right to relief and must prove, as a matter of law, "that he has a right of ownership and that the adverse claim is a cloud on the title that equity will remove." *Id.*; *Hahn*, 321 S.W.3d at 531.

In its conclusions of law, the trial court concluded, "Because the Contract does not comply with Section 5, Subchapter D of the Texas Property Code, [Ferrara's] suit to quiet title should be denied." As we have already discussed, Subchapter D applies to a particular type of executory contract: "an executory contract for

19

conveyance of real property used or to be used as the purchaser's residence or as the residence of a person related to the purchaser within the second degree by consanguinity or affinity." TEX. PROP. CODE ANN. § 5.062(a). Section 5.062 specifically states that it does not apply to certain types of executory contracts. For example, section 5.062 states that Subchapter D does not apply to transactions under an executory contract for "the sale of state land," sale of land by the Veterans' Land Board, sale of land by the state or a political subdivision of the state, or executory contracts that provide for delivery of a deed to the purchaser within 180 days of the final execution of the executory contract. *See id.* § 5.062(b)–(c). Thus, the protections enumerated within the provisions of Subchapter D do not apply to every contract for deed. However, it does not follow that because Subchapter D does not apply, these contracts for deed are invalid or that purchasers under these contracts cannot prevail on suits to quiet title. We therefore agree with Ferrara that the trial court erred to the extent that it dismissed Ferrara's suit to quiet title against Dalu solely because Subchapter D did not apply to the Contract. We therefore turn to whether Ferrara established that he, as a purchaser under a contract for deed, prevails on his suit to quiet title against Dalu, a subsequent purchaser of the property.

Upon execution of the contract for deed, the purchaser acquires an "equitable right to make payments on the property and to receive a deed and legal title when he complete[s] the payments." *Gaona v. Gonzales*, 997 S.W.2d 784, 786–87 (Tex.

20

App.—Austin 1999, no pet.); *see Cadle Co. v. Harvey*, 46 S.W.3d 282, 287 (Tex. App.—Fort Worth 2001, pet. denied) ("It is well-settled that a purchaser under a contract of sale for real property [contract for deed] acquires an equitable interest in the property."). The purchaser obtains not just an equitable right but equitable title in property sold under a contract for deed when the purchaser has "paid the purchase price and fully performed the obligations under the contract." *Cullins v. Foster*, 171 S.W.3d 521, 533 (Tex. App.—Houston [14th Dist.] 2005, pet. denied); *Tex. Am. Bank/Levelland v. Resendez*, 706 S.W.2d 343, 346 (Tex. App.—Amarillo 1986, no writ) (holding that when purchasers under contract for deed paid purchase price and completed performance under contract, "their equitable right ripened into an equitable title"). While the purchaser under a contract for deed "obtains an immediate right to possession" of the property, the seller "retains legal title and has no obligation to transfer it unless and until the purchaser finishes paying the full purchase price . . . which is typically done in installments over several years." *Shook*, 368 S.W.3d at 624.

Here, it is undisputed that Ferrara and Nutt entered into the Contract in May 2011. Although Nutt retained legal title to the property, Ferrara had an equitable right to enforce the Contract. *See Gaona*, 997 S.W.2d at 787 (holding that until purchaser fully performed contract for deed, seller retained legal title subject to purchaser's equitable rights and that subsequent judgment creditor who obtained lien

21

on property could only acquire legal title subject to purchaser's equitable rights). When Nutt sold the property to Dalu in June 2013, more than two years after execution of the Contract, Ferrara had not fully performed his obligations under the Contract. Ferrara thereupon promptly filed suit against Nutt for breach of the Contract, and he filed a suit to quiet title against Dalu.

As the plaintiff in the suit to quiet title, Ferrara bore the burden to establish his superior equity and right to relief. *See Essex Crane*, 371 S.W.3d at 388; *Hahn*, 321 S.W.3d at 531. Ferrara presented evidence that he made rental payments to Nutt from execution of the Contract until Dalu purchased the property from Nutt. As the trial court found, however, Ferrara presented no evidence that he made the $3,000 earnest money deposit required by the Contract. Ferrara therefore has not established that he has equitable or legal title to the property superior to that of Dalu's. *See Essex Crane*, 371 S.W.3d at 388; *Hahn*, 321 S.W.3d at 531; *see also Nguyen*, 317 S.W.3d at 270 (stating that when party challenges legal sufficiency of adverse finding on which he had burden of proof at trial, he must demonstrate on appeal that evidence establishes, as matter of law, all vital facts in support of issue).

We therefore hold that the trial court did not err by dismissing Ferrara's suit to quiet title.[2]

---

[2] In his third issue, Ferrara argues that Dalu is required to convey the property to him because the Contract includes a provision stating that its terms are binding on the parties' "successors and assigns." Because Ferrara has not established that he has

22

**Ferrara's Remaining Causes of Action**

Also in his second issue, Ferrara argues that the trial court erroneously ignored the fact that Dalu had knowledge of Ferrara's contractual relationship with Nutt and therefore erred by dismissing Ferrara's other causes of action against Dalu. In its conclusions of law, the trial court concluded that there was no or insufficient evidence presented to support Ferrara's claims against Dalu for breach of contract, fraud, DTPA violations, breach of fiduciary duty, tortious interference with contract, and money had and received, and the court dismissed these claims. We therefore address whether the trial court properly dismissed these claims.

**A.     *Fraud and DTPA***

Ferrara asserted causes of action for common law fraud and fraud in a real estate transaction under Business and Commerce Code section 27.01.

The elements of common law fraud are:

(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

---

performed his obligations under the Contract—specifically, because he has not established that he ever paid the earnest money deposit required by the Contract—we hold that Ferrara has not established that Dalu, as Nutt's successor, is bound under the Contract to convey the property to Ferrara on the closing date specified in the Contract. We therefore overrule Ferrara's third issue.

23

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)).

Fraud in a real estate transaction consists of (1) a "false representation of a past or existing material fact" when the false representation is "made to a person for the purpose of inducing that person to enter into a contract" and is "relied on by that person in entering into that contract," or (2) a "false promise to do an act" when the false promise is material, made with the intention of not fulfilling it, made to a person for the purpose of inducing that person to enter into a contract, and relied on by that person in entering into that contract. TEX. BUS. & COM. CODE ANN. § 27.01(a) (West 2015). Section 27.01 also provides that a person commits the fraud described in subsection (a) if the person has actual awareness of the falsity of a representation or promise made by another person, fails to disclose the falsity of the representation or promise to the person defrauded, and benefits from the false representation or promise. *Id.* § 27.01(d). "A violation of Section 27.01 that relates to the transfer of title to real estate is a false, misleading, or deceptive act or practice as defined by [the DTPA], and any public remedy under [the DTPA] is available for a violation of that section." *Id.* § 27.015(b) (West Supp. 2017).

Ferrara argues that the trial court erred in dismissing his fraud and DTPA causes of action against Dalu because "[t]he record unequivocally demonstrates that

Dalu knew that [Nutt] was not free to convey the Property to him free from any encumbrances." Dalu's knowledge concerning the contractual relationship between Ferrara and Nutt, however, has no bearing on the merits of Ferrara's fraud claims.

To prevail on both his common law fraud and fraud in a real estate transaction claims, Ferrara was required to establish that a material misrepresentation was made to him, and, in the context of his fraud in a real estate transaction claims, he was required to establish that the misrepresentation was made to him for the purpose of inducing him to enter into a contract. *See Italian Cowboy Partners*, 341 S.W.3d at 337; TEX. BUS. & COM. CODE ANN. § 27.01(a). Ferrara and Nutt entered into the Contract in May 2011. There is no evidence that Nutt or Dalu made any misrepresentations to Ferrara at that time to induce him into entering into the Contract. Indeed, Ferrara can point to no evidence in the record of any misrepresentations made to him at any relevant point in time, nor can he point to any evidence in the record that Nutt entered into the Contract with no intention to perform the Contract. *See Zaragoza v. Jessen*, 511 S.W.3d 816, 824 (Tex. App.— El Paso 2016, no pet.) (upholding trial court's finding that sellers committed fraud in real estate transaction because evidence was presented that they had no intent to perform under contract).

Because Ferrara presented no evidence that a material misrepresentation was made to him, the trial court did not err in dismissing Ferrara's common law and

statutory fraud claims against Dalu. Similarly, because the trial court did not err in dismissing Ferrara's statutory fraud claim against Dalu, the trial court also did not err in dismissing Ferrara's DTPA claim against Dalu, which was based on Business and Commerce Code section 27.01 being a "tie-in" statute to the DTPA. *See* TEX. BUS. & COM. CODE ANN. § 27.015(b); *id.* § 17.43 (West 2011) ("An act or practice that is a violation of a provision of law other than [the DTPA] may be made the basis of an action under [the DTPA] if the act or practice . . . is declared by such other law to be actionable under [the DTPA].").

## B.    *Tortious Interference with Contract*

To prevail on his claim for tortious interference with contract, Ferrara was required to establish: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) the willful and intentional interference caused damage; and (4) actual damage or loss occurred. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 588 (Tex. 2017). "To establish a willful and intentional act of interference, there must be evidence that the defendant was more than a willing participant—the defendant must have knowingly induced one of the contracting parties to breach its obligations under a contract." *Greenville Automatic Gas Co. v. Automatic Propane Gas & Supply, LLC*, 465 S.W.3d 778, 786–87 (Tex. App.—Dallas 2015, no pet.); *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

26

Ferrara argues that Dalu was aware that Ferrara had an ownership interest in the property but purchased the property from Nutt anyway. Dalu testified that he was aware that Nutt and Ferrara had a contractual relationship, but he was not aware of the specifics of that relationship. He testified that he believed Nutt had leased the property to Ferrara and that Ferrara then leased the property to Rodriguez to make a "commission" for himself. If Nutt had simply leased the property to Ferrara, as owner of legal title, she could have conveyed the property to Dalu without necessarily breaching the terms of a lease. The record therefore contains some evidence that Dalu did not knowingly induce Nutt to breach her obligations under the Contract and thus Dalu did not willfully and intentionally interfere with the Contract, an essential element of Ferrara's tortious interference claim. We conclude that the trial court did not err in dismissing Ferrara's tortious interference with contract claim. *See Nguyen*, 317 S.W.3d at 267 (stating that we uphold trial court's conclusions of law if judgment can be sustained on any legal theory supported by evidence).

## C. *Breach of Fiduciary Duty*

Texas courts have held that both formal and informal relationships may give rise to a fiduciary duty. *Areda v. S-W Transp., Inc.*, 365 S.W.3d 838, 841 (Tex. App.—Dallas 2012, no pet.). "These informal relationships, termed 'confidential relationships,' may arise 'where one person trusts in and relies upon another,

27

whether the relation is a moral, social, domestic, or merely personal one.'" *Id.* (quoting *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992)). "A confidential relationship exists in those cases in which 'influence has been acquired and abused, in which confidence has been reposed and betrayed.'" *Id.* (quoting *Crim Truck & Tractor*, 823 S.W.2d at 594). A person is justified in placing his confidence in the belief that another party will act in his best interest "only where he is accustomed to being guided by the other party's judgment and advice and there exists a long association in a business relationship as well as a personal friendship." *Id.* (citing *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 304 (Tex. App.—Dallas 2009, no pet.)); *Bazan v. Munoz*, 444 S.W.3d 110, 118 (Tex. App.— San Antonio 2014, no pet.) ("[C]onfidential relationships may arise when the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest."). We determine the existence of a fiduciary relationship by considering the "actualities of the relationship between the persons involved." *Areda*, 365 S.W.3d at 841 (quoting *Esty*, 298 S.W.3d at 304). "A fiduciary duty is an extraordinary duty which will not be lightly created." *Id.*

To establish the existence of an informal fiduciary relationship, "the record must show that one of the parties relied on the other 'for moral, financial, or personal support or guidance.'" *Lee v. Hasson*, 286 S.W.3d 1, 14–15 (Tex. App.—Houston

28

[14th Dist.] 2007, pet. denied) (quoting *Trostle v. Trostle*, 77 S.W.3d 908, 915 (Tex. App.—Amarillo 2002, no pet.)).  The length of the relationship is an "important factor" in determining whether a fiduciary relationship exists, "[b]ut even a longstanding relationship of friendship or cordiality is insufficient, without more, to establish an informal fiduciary relationship."  *Id.* at 15.  The existence of a confidential relationship is ordinarily a fact question, but "when the issue is one of no evidence, it becomes a question of law."  *Areda*, 365 S.W.3d at 841–42.

Ferrara argues that the trial court erred in dismissing his breach of fiduciary duty claims because the record "clearly shows that Dalu and Nutt had a fiduciary duty to Ferrara and breached the same in order to further their own interests."  As supporting evidence, Ferrara points to evidence in the record that all three individuals had lived in the same neighborhood and had been friends for around fifteen years.  Ferrara and his family visited Dalu's convenience store on a near-daily basis, and Ferrara's children would mow Nutt's lawn.  Nutt told Ferrara that she wanted to sell him the property to benefit his children, and Dalu testified that he considered Ferrara's children like his own children.  Ferrara thus argues that the record demonstrates that, "in light of the friendship he had with both Nutt and Dalu, [he] placed his trust in both of them."

While the evidence of the longstanding friendship that Ferrara had with both Nutt and Dalu is undisputed, this is not enough, by itself, to create a "confidential

relationship" that gives rise to a fiduciary duty. *See Lee*, 286 S.W.3d at 15. Ferrara presented no evidence that, in addition to his personal friendship with Nutt and Dalu, he also has "a long association in a business relationship" with them. *See Areda*, 365 S.W.3d at 841. Ferrara also presented no evidence that he is "accustomed to being guided by [Nutt's and Dalu's] judgment and advice," *see id.*, or that he relied on Nutt and Dalu "for moral, financial, or personal support or guidance." *See Lee*, 286 S.W.3d at 15. Based on this record, we conclude that the trial court did not err by declining to impose an "extraordinary" fiduciary duty onto Nutt and Dalu and dismissing Ferrara's claims for breach of fiduciary duty.

### D.    *Money Had and Received*

Money had and received is a cause of action that is equitable in nature and "belongs conceptually to the doctrine of unjust enrichment." *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied) (quoting *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ)). This cause of action is "not premised on wrongdoing," but instead "seeks to restore money where equity and good conscience require restitution." *Id.* To prove this claim, the plaintiff must demonstrate that the defendant "holds money which in equity and good conscience belongs to him." *Id.* Decisions concerning claims for money had and received are "dependent upon a balancing of the equities in each unique case." *Id.* at 838.

Ferrara states on appeal that the trial court erred in dismissing his claim for money had and received; however, he makes no specific argument concerning this contention, and he cites no authorities relevant to reviewing claims for money had and received. Ferrara does not identify on appeal the money that Dalu allegedly holds that "in equity and good conscience" belongs to Ferrara. *Id.* at 837. We therefore conclude that Ferrara has failed to adequately brief his contention that the trial court erred by dismissing his claim against Dalu for money had and received. *See* TEX. R. APP. P. 38.1(i) (providing that appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

We overrule Ferrara's second issue.

**Conclusion**

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Brown, and Lloyd.

31